Case No. 23-2304

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**NEONODE SMARTPHONE LLC**,

*Plaintiff-Appellant*,

v.

**SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC.,**

*Defendants-Appellees.*

Appeal from the United States District Court for the Western District of Texas, Case No. 6:20-CV-00507-ADA, Judge Alan D Albright

# OPENING BRIEF OF APPELLANT NEONODE SMARTPHONE LLC

Philip Graves
Greer Shaw
GRAVES & SHAW LLP
355 S. Grand Ave., Suite 2450
Los Angeles, CA 90071
(213) 204-5101

Brian D. Melton
Bryce Barcelo
Rocco Magni
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 653-7825

Kalpana Srinivasan
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100

*Counsel for Appellant Neonode Smartphone LLC*

**Exemplary Claim of U.S. Patent No. 8,095,879**

1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

> a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

Appx0091.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-2304

**Short Case Caption** Neonode Smartphone LLC v. Samsung Electronics Co., Ltd

**Filing Party/Entity** Neonode Smartphone LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/18/2023

Signature: /s/ Philip Graves

Name: Philip Graves

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Neonode Smartphone LLC | | Aequitas Technologies LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Gregory Phillip Love<br>Steckler Wayne Cherry & Love PLLC | Justin Wayne Allen<br>Cherry Johnson Siegmund James PLLC | |
| Craig Cherry<br>Cherry Johnson Siegmund James PLLC | | |
| Mark Siegmund<br>Cherry Johnson Siegmund James PLLC | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


I. STATEMENT OF RELATED CASES .... 1

II. STATEMENT OF JURISDICTION .... 1

III. STATEMENT OF THE ISSUES .... 2

IV. STATEMENT OF THE CASE .... 2

A. The ’879 Patent .... 3

B. The Prosecution History .... 6

C. The Litigation, IPRs, and Claim Construction Order .... 10

V. SUMMARY OF THE ARGUMENT .... 14

VI. ARGUMENT .... 17

A. Standard of Review .... 17

B. The District Court Erred in Concluding that Claim 1 is Indefinite. .... 18

1. The District Court Erred in Determining that the “Only One Option” Language is Unclear Because it Could Purportedly Refer to a Gesture or a Function. .... 19

a. The District Court Failed to Correctly Apply the *Nautilus* Standard to Samsung’s “Three Meanings” Argument. .... 19

b. Samsung’s “First Meaning.” .... 26

i “Single Function.” .... 27

ii “One Specific Gesture.” .... 31

c. Samsung’s “Second Meaning.” .... 39

d. Samsung’s “Third Meaning.” .... 41

e. The District Court's Unexamined Acceptance of Samsung's "Three Meanings" Argument Led it to Error.....42

2. The District Court Erred in Determining that "Only One Option" Could Refer to "Presenting the User with an Icon.".....44

3. The District Court Overlooked Dr. Rosenberg's Declaration, Which Confirms That a POSITA Would Understand the Meaning of Limitation 1[b] with Reasonable Certainty. .....49

C. The Intrinsic Record Supports Neonode's Plain Meaning Construction of Limitation 1[b]. .....51

1. The Claim Supports a Plain Meaning Construction of Limitation 1[b].....52

2. The Specification Supports a Plain Meaning Construction of Limitation 1[b].....53

3. The Prosecution File Supports a Plain Meaning Construction of Limitation 1[b].....56

4. The IPR Record Supports a Plain Meaning Construction of Limitation 1[b].....62

5. The Intrinsic Record Supports Neonode's Construction.....64

VII. CONCLUSION.....64

ADDENDUM .....66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*01 Communique Lab., Inc. v. LogMeIn, Inc.*,
687 F.3d 1292 (Fed. Cir. 2012) ....................27, 29, 53

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
616 F.3d 1283 (Fed. Cir. 2010) ....................40

*All Dental Prodx, LLC v. Advantage Dental Products, Inc.*,
309 F.3d 774 (Fed. Cir. 2002) ....................24

*Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*,
359 F.3d 1367 (Fed. Cir. 2004) ....................21

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017) ....................17, 18

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
334 F.3d 1294 (Fed. Cir. 2003) ....................52

*ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*,
35 F.4th 1345 (Fed. Cir. 2022) ....................25, 26, 44

*Convolve, Inc. v. Compaq Computer Corp.*,
812 F.3d 1313 (Fed. Cir. 2016) ....................27, 53

*Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*,
838 F.3d 1224 (Fed. Cir. 2016) ....................18, 24

*Funai Elec. Co. v. Daewoo Electronics Corp.*,
616 F.3d 1357 (Fed. Cir. 2010) ....................51

*Grace Instrument Indus., LLC v. Chandler Instruments Co.*,
57 F.4th 1001 (Fed. Cir. 2023) ....................19, 21, 49

*IGT v. Bally Gaming Int'l, Inc.*,
659 F.3d 1109 (Fed. Cir. 2011) ....................25

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) ....................42, 43

*Lexion Medical, LLC v. Northgate Technologies, Inc.*,
641 F.3d 1352 (Fed. Cir. 2011) ....................................................................52

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
800 F.3d 1366 (Fed. Cir. 2015) ....................................................................43

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
831 F.3d 1350 (Fed. Cir. 2016) ....................................................................31

*Nature Simulation Systems Inc. v. Autodesk, Inc.*,
50 F.4th 1358 (Fed. Cir. 2022) ..............................................................18, 23

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)......................................................................... *passim*

*Nevro Corp. v. Boston Scientific Corp.*,
955 F.3d 35 (Fed. Cir. 2020) ..................................................23, 25, 26, 51

*One-E-Way, Inc. v. International Trade Commission*,
859 F.3d 1059 (Fed. Cir. 2017) ..............................................21, 23, 60, 62

*Pause Technology, LLC v. TiVo, Inc.*,
419 F.3d 1326 (Fed. Cir. 2005) ...............................................................24, 32

*Personalized Media Communications, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) ........................................................... *passim*

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........................................................... *passim*

*Primos, Inc. v. Hunter's Specialties, Inc.*,
451 F.3d 841 (Fed. Cir. 2006) ................................................................21, 40

*Research Plastics v. Federal Packaging*,
421 F.3d 1290 (Fed. Cir. 2005) ....................................................................41

*Sequoia Technology, LLC v. Dell, Inc.*,
66 F.4th 1317 (Fed. Cir. 2023) .....................................................................62

*Sound View Innovations, LLC v. Hulu, LLC*,
33 F.4th 1326 (Fed. Cir. 2022) .....................................................................24

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015).......................................................................................18

*TiVo, Inc. v. EchoStar Commc'ns Corp.*,
516 F.3d 1290 (Fed. Cir. 2008) ..................................................................27, 53

*University of Massachusetts v. L'Oréal S.A.*,
36 F.4th 1374 (Fed. Cir. 2022) ......................................................24, 58, 59, 62

**Statutes**

28 U.S.C. § 1295(a)(1)..........................................................................................1

28 U.S.C. § 1331 .....................................................................................................1

28 U.S.C. § 1338 .....................................................................................................1

35 U.S.C. § 112 .......................................................................................................3

## I. STATEMENT OF RELATED CASES

No appeal in or from the same proceeding was previously before this Court.

The following pending cases may directly affect or be directly affected by the Court's decision in this appeal:

*Neonode Smartphone LLC v. Apple Inc.*, No. 21-cv-08872-EMC (N.D. Cal.)

*Neonode Smartphone LLC v. Samsung Electronics Co. Ltd.*, No. 20-cv-00507 (W.D. Tex.)

*Neonode Smartphone LLC v. Samsung Electronics Co. Ltd.*, No. 22-2134 (Fed. Cir.)

*Samsung Electronics Co. Ltd. v. Neonode Smartphone LLC*, No. 23-1464 (Fed. Cir.)

*Google LLC v. Neonode Smartphone LLC,* No. 23-1638 (Fed. Cir.)

Counsel is unaware of any other pending case that may directly affect or be directly affected by the Court's decision in this appeal.

## II. STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1295(a)(1). The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338 over this action for patent infringement. The district court granted final judgment in favor of Defendants-Appellees Samsung Electronics Co. Ltd. and Samsung Electronics America, Inc.

(collectively, "Samsung"). Appx0035. Plaintiff-Appellant Neonode Smartphone LLC timely appealed on August 11, 2023. Appx3554.

## III. STATEMENT OF THE ISSUES

1. Did the district court err in concluding that the phrase "the representation consists of only one option for activating the function" is indefinite?

2. Did the district court err in rejecting Neonode's proposed construction of the phrase "the representation consists of only one option for activating the function?"

## IV. STATEMENT OF THE CASE

This case comes before the Court on appeal from a final judgment following an order entered in the United States District Court for the Western District of Texas finding the sole independent claim of U.S. Patent No. 8,095,879 ("the '879 Patent") indefinite. Claim 1 recites:

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
>
> > [a] a touch sensitive area in which a representation of a function is provided,
> >
> > [b] ***wherein the representation consists of only one option for activating the function***
> >
> > [c] and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location

> where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location,
>
> [d] wherein the representation of the function is not relocated or duplicated during the gliding.

Appx0091 (emphasis added).[1] The district court held limitation 1[b] to be indefinite. Appx0031. Claim 1 is the sole independent claim of the '879 Patent. The court subsequently entered judgment for Samsung, finding all claims of the '879 Patent invalid under 35 U.S.C. § 112, ¶ 2. Appx0035.

### A. The '879 Patent

The invention claimed in the '879 Patent grew out of research and development undertaken by the inventor, Magnus Goertz, on behalf of the company he co-founded, Neonode AB. Appx0095. Neonode AB and its affiliated and successor entities developed and commercialized an early smartphone, the Neonode N1, which incorporated the revolutionary "Neno" interface. The N1 and its successor, the N2, were small enough to fit in the palm of your hand, and the patented interface allowed the user to navigate menus and functions with simple finger-based swipes and taps. *Id.*

The application from which the '879 Patent issued was filed in 2002. It teaches a novel user interface for a touchscreen mobile handheld computer configured to present representations of predefined functions activatable by a "touch

[1] Hereinafter all emphases are added unless otherwise indicated.

and glide" movement of an object along the display. Appx0089, 1:65–2:14. Figure 1 illustrates the "user interface" with "a touch sensitive area 1, which is divided into a menu area 2 and a display area 3:"




Fig. 1.

Appx0090, 3:51–54, Fig. 1. In the illustrated embodiment, the user interface presents representations of functions 21, 22, and 23, comprising an application dependent function (21), a keyboard function (22), and a task and file manager function (23), respectively. Appx0090, 4:1–12.

Figure 2 shows how a user can activate the functions of representations 21–23 by touching the display at the location of a representation and gliding along the display away from the touched location:




*Fig. 2.*

*Id.*, 4:7–16, Fig. 2.

When a function associated with one of representations 21–23 is activated, the display presents icons for application or system functions, which may in turn be activated by tapping the icon. For example, if a user activates the application-dependent function of representation 21, the touchscreen will display icons for "the current active application." *Id.* at 4:13–34. Alternatively, if the user activates the application-dependent function of representation 21 and there is no application running, the touchscreen will display icons 211, 212, 213, 214, 215, and 216, which represent services or settings of the operating system:



Fig. 3.

*Id.*, Fig. 3.

### B. The Prosecution History

The ’879 Patent underwent a nine-year prosecution, in the course of which the examiner rejected an earlier version of claim 1 over a combination that included U.S. Pub 2002/0027549 (“Hirshberg”). Appx2940. Hirshberg disclosed a multifunction keypad on a touchscreen interface that included “thirteen 4-way soft keys (e.g. keys 100, 102 and 104), one 3-way soft key 106 and one regular one function soft key 108.” Appx1256, ¶ 54. Hirshberg’s Figure 1 depicts these keys:




Figure 1

Appx1242. Hirshberg teaches that the characters of the multi-function keys are selected by touching and tracing across the key:

> The keys in the keypad can be a mix of regular one-function keys like key 108 with other multi function keys. In the case of one function a regular touch operation activate [sic] the function. In multi-function key [sic] the first touch on the key activate [sic] the key and the relative trace created by the movement or the tilt on the touch with respect to the initial touch point is selecting the appropriate function among the functions that associated with the selected key.

Appx1256, ¶ 55. As Hirshberg further explained:

> Using the basic principal [sic] of having soft key selected by the initial contact point on any location on the key then selecting ***one of several options*** based on the trace, one can modify the shape of the key, the labeling logic, the

> numbers of functions, the definition of the decision zones and the decision logic in several different ways.

Appx1259, ¶ 82.

In response to the examiner's rejection over Hirshberg, the applicant amended claim 1 to add the "only one option" language that the district court later found to be indefinite:

> a touch sensitive area in which ~~representations~~ a representation of ~~at least one~~ a function ~~are displayed, and each function of said at least one function being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed, and being~~ is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the ~~corresponding~~ touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location.

Appx2935.

The applicant explained that, to enter a character in Hirshberg's interface, "a user first touches ***a key representing several characters***, and then drags his finger in a specific direction to ***select one of the several characters***." Appx2941. The applicant pointed to Hirshberg's paragraph 55, highlighting that:

> Hirshberg recites:
>
> > In multi-function key [sic] the first touch on the key activate [sic] the key and the relative trace ... is selecting the appropriate function among the functions associated with the selected key.

*Id.* The applicant then distinguished Hirshberg on the basis that:

> Hirshberg teaches a touch and glide operation only for keys that comprise several characters. On the contrary, for single character keys Hirshberg teaches using a conventional touch operation without a glide . . . . Thus, at par. [0055], Hirshberg recites:
>
> > In the case of one function a regular touch operation activate [sic] the function.
>
> Further, at par. [0074], Hirshberg recites:
>
> > ... a single-function mode wherein a single function is elected on contact with a given key, independent of the direction of motion.
>
> In distinction, the claimed invention uses a multi-step touch-and-glide operation for representations that consist of only one option for activating a function.

Appx2941–2942 (emphasis in original). The applicant went on:

> In order to further distinguish the claimed invention over Hirshberg, applicant has amended claim 1 to include the limitation that the representation of the function consists of only one option for activating the function.

Appx2942.

The applicant identified support for the amended claim language, pointing to the representations of functions 21–23:

> Applicant notes that each representation 21 - 23, shown in FIG. 1 of the original specification, consists of only one option for activating its corresponding function. Indeed, element 21 ***consists of the one option of*** displaying icons as appropriate for a currently active application, as described at par. [0048] and shown in FIG. 3 of the original specification. Element 22 ***consists of the one***

> ***option of*** opening a keypad and text window, as described at par. [0052] and shown in FIG. 5 of the original specification. Element 23 ***consists of the one option of*** opening a list of computer system applications and files, as described at par. [0058] and shown in FIG. 6 of the original specification. Moreover, each of these ***one-option elements*** is activated by a multi-step touch-and-glide operation, as described at pars. [0016] and [0047] of the original specification.

Appx2943 (emphasis added; underlining in original).

The examiner then allowed claim 1 and most of the dependent claims, subject to an examiner's amendment that is not relevant here.

### C. The Litigation, IPRs, and Claim Construction Order

Neonode sued Samsung Electronics Co. Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung") for infringement of the '879 Patent on June 8, 2020.[2] Appx0093.

Samsung and Apple Inc. ("Apple") jointly filed a petition for inter partes review of the '879 Patent on November 6, 2020. Appx1303. The PTAB first denied institution of the petition, then changed course and granted institution on a motion for rehearing. Appx1303–1304. The PTAB subsequently issued a Final Written Decision finding no challenged claims of the '879 Patent to be unpatentable.

[2] Neonode also asserted U.S. Patent No. 8,812,993 ("the '993 Patent"). The claims at issue of the '993 Patent were later found to be unpatentable in IPR2021-00145. The district court then severed the '993 Patent to a separate action and stayed that case. The Final Written Decision in that IPR is currently on appeal to this Court in Case No. 22-2134.

Appx1185–1186. The PTAB's determination was based in part on Neonode's evidence of industry praise for the N1 and N2 phones incorporating the patented user interface, as well as the fact that in 2005 Samsung had licensed the application from which the '879 Patent issued. Appx1229–1236.

In the meantime, Google LLC ("Google") filed a second petition for inter partes review of the '879 Patent. The Board issued a Final Written Decision finding none of the challenged claims to be unpatentable on January 11, 2023. Appx1262–1263.

After the district court lifted a stay that had been entered in the action, the parties commenced claim construction briefing. Samsung argued that limitation 1[b], "the representation consists of only one option for activating the function," is indefinite because it is purportedly subject to three possible meanings, mapping "only one option" to either a single function or a single input gesture. Appx0211. Neonode argued that "only one option" refers to the number of functions that could be activated at a given time, and that limitation 1[b] should be given its plain and ordinary meaning, i.e., "***the representation consists of only one option for activating one of the one or more functions at any given time***." Appx1051; Appx1059. Pointing to the claim as a whole, the specification, the IPR record and, most pertinently, the applicant's amendment and arguments to overcome Hirshberg—in which the applicant explained how the newly added claim language

distinguished Hirshberg's multi-function keys, and gave three examples of representations "consist[ing] of the one option of" activating a function—Neonode argued that the intrinsic record provides sufficient guidance to satisfy the "reasonable certainty" standard of *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 910, 134 S.Ct. 2120 (2014). Appx1059–1066; Appx3539–3544. In addition, Neonode explained why none of Samsung's proposed "three meanings" is a plausible reading of the claim in light of the intrinsic record. Appx1064–1066; Appx3543.

The district court conducted the *Markman* hearing on July 7, 2023. One week later, the court issued its Final Claim Constructions, Appx0011–0012, and Claim Construction Order ("Order"), Appx0013–0031, holding limitation 1[b] indefinite. The court determined that the "only one option" phrase rendered claim 1 indefinite because it "might mean several different things and no informed and confident choice is available among the contending definitions." Appx0029. Specifically, the court held that "it is unclear to a POSITA whether the claim term 'only one option' refers to either a ***gesture*** or ***function*** (as Samsung asserts) or to <u>***presenting***</u> ***the user with an*** <u>***icon***</u> (as Neonode appears to contend)." Appx0030 (emphasis in original). The court largely ignored the claim and the prosecution record, focusing instead on the fact that the word "option" does not appear in the specification. The court reiterated this point three times. Appx0024 ("The word 'option' does not appear in

the specification.”); Appx0029 (“the word ‘option’ does not appear in the specification . . . .”); Appx0030 (“Again, the specification does not define ‘option.’”). The district court also mischaracterized Neonode’s argument, erroneously stating that Neonode argued that “option” refers to “icons” and then rejecting this argument that Neonode had never made, characterizing the issue as “critical[]” to the court’s analysis. Appx0030–0031. In addition, the district court incorrectly stated that “Neonode does not rely on an expert for its claim construction briefing,” Appx0020, when Neonode had in fact submitted a 44-page expert declaration. The court then stated that “if the term ‘option’ does indeed refer to gestures or functions (rather than ‘icons’ or graphical user interface elements), then there are three equally competing interpretations of what this claim term means,” referring to its summary of Samsung’s argument. Appx0031.[3] The court did not, however, explain why or how it had arrived at the conclusion that all (or even any) of Samsung’s “three meanings” were “equally competing” in light of the intrinsic record, or address any of Neonode’s arguments showing that Samsung’s interpretations were unsupported by the intrinsic record. *Id.*

[3] The court also addressed a second set of claim terms and phrases that Samsung contended are indefinite, finding that they are not indefinite. Neonode does not appeal that portion of the court’s Order, and Neonode’s statements concerning the Order are directed solely to the portion concerning limitation 1[b].

## V. SUMMARY OF THE ARGUMENT

Three primary legal errors infect the district court's analysis and conclusion that limitation 1[b] renders claim 1 indefinite.

First, the district court failed to correctly apply the *Nautilus* standard to Samsung's indefiniteness argument. The court concluded that "it is unclear to a POSITA whether the claim term 'only one option' refers to either a ***gesture*** or ***function*** (as Samsung asserts) or to ***presenting the user with an icon*** (as Neonode appears to contend)." Appx0030 (emphasis in original). In arriving at this conclusion, the court failed to consider the complete intrinsic record, instead fixating on the absence of the word "option" in the specification. The district court ignored the remainder of the claim, dismissed the prosecution file, and overlooked even the teaching of the specification itself—which provides ***three examples*** of the representation recited in limitation 1[b]—because "the specification does not define 'option.'" Appx0029–0030. The court then pointed to Samsung's assertion that limitation 1[b] is susceptible to three different meanings involving different iterations of "gestures" and "functions," and concluded from this that the claim is indefinite. Appx0031. Apart from its misguided fixation on the absence of "option" in the specification, the district court did not explain how Samsung's three proposed interpretations of the claim language could be found to be plausible in light of the intrinsic record, or why it had rejected Neonode's arguments. In fact, **none** of

Samsung's three interpretations are supported by the intrinsic record, so they cannot support the court's conclusion that claim 1 is indefinite. The district court's failure to consider the entire intrinsic record, resulting in its misguided conclusion that Samsung's "three interpretations" argument renders the claim indefinite, requires reversal.

Second, the district court's conclusion that limitation 1[b] could be understood to refer to "***presenting the user with an icon***," Appx0030 (emphasis in original), is both wrong and based on a misunderstanding of Neonode's argument. Neonode never argued that limitation 1[b] refers to presenting the user with an icon. Nor did Samsung. In fact, there is no support in the intrinsic record for such an argument. Nevertheless, the district court cited this as one of its reasons for concluding that the "only one option" language is indefinite, despite the fact that it also, inconsistently, indicated that it disagreed with this purported argument. And the court considered this sideshow to be important—indeed, "critical[]"—to its conclusion. The district court's confused attribution to Neonode of an argument it never made, as well as its failure to consider the intrinsic record in connection with its "icon" argument or to substantively address the arguments that Neonode actually did make, requires reversal.

Moreover, while the intrinsic record is sufficient to establish that limitation 1[b]—and therefore claim 1—is not indefinite, it is notable that ***the district court***

***was not even aware that Neonode had filed the declaration of its expert, Dr. Rosenberg***. Dr. Rosenberg explained how a POSITA would understand the claim language and why the assertions of Samsung's expert were incorrect. Appx1088–1103. The district court's ignorance of Dr. Rosenberg's declaration exemplifies the deficiencies in the court's analysis.

Third, the intrinsic record enables a POSITA to understand limitation 1[b] with reasonable certainty. As Neonode argued below, limitation 1[b] should be given a plain meaning construction, which is "***the representation consists of only one option for activating one of the one or more functions at any given time***." Appx1059. The structure of the claim as a whole, the specification, the prosecution file, and the IPR record all support this construction:

- The claim language indicates that "the function" of limitation 1[b] references "one or more functions."
- The specification provides three examples of the representation recited in limitation 1[b]: representations of functions 21–23, each of which provides only one option for activating a function associated with the representation at any given time.
- The prosecution file shows that limitation 1[b] was added in order to narrow claim 1 to a combination not disclosed by Hirshberg: a representation that presents ***only one option for activating a function***

at any given time, activatable by a touch and glide operation. The applicant confirmed this in the description of the support for the new "only one option" language, explaining that each of the representations 21–23 "***consists of the one option of***" activating a represented function.

- The IPR record bolsters a plain meaning construction of limitation 1[b]. In the Google IPR, Neonode consistently argued that the limitation limits the claim to only a single option in terms of ***what to activate***.

The intrinsic record supports Neonode's proposed construction. This Court should reverse the district court's judgment of invalidity, adopt Neonode's construction of limitation 1[b], and remand for further proceedings.

# VI. <u>ARGUMENT</u>

## A. Standard of Review

This Court reviews a determination of indefiniteness *de novo*. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). "Determinations about governing legal standards and about intrinsic evidence are reviewed de novo, and any factual findings about extrinsic evidence relevant to the question, such as evidence about knowledge of those skilled in the art, are reviewed for clear error." *Id.* (citing *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015)).

The district court's ruling rested entirely on its analysis of the specification—or, more specifically, what the specification purportedly did not teach—and, to a lesser extent, the claims. Appx0029–0031. The court made no factual findings concerning whether any terms at issue had a particular meaning to a POSITA. Nor did the court resolve any other disputed issues of fact. "[W]hen the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law, and the Court of Appeals will review that construction *de novo*." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331, 135 S.Ct. 831, 841 (2015). Accordingly, this Court reviews the district court's analysis and conclusion of indefiniteness *de novo*. *BASF Corp.*, 875 F.3d at 1365.

**B. The District Court Erred in Concluding that Claim 1 is Indefinite.**

A patent is indefinite only "if its claims, read in light of the patent's specification and prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The "dispositive question in an indefiniteness inquiry is whether the 'claims,' not particular claim terms," fail to inform a POSITA about the scope of the invention. *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1231 (Fed. Cir. 2016). Reasonable certainty, not absolute precision, is all that is required. *Nature Simulation Systems Inc. v.*

*Autodesk, Inc.*, 50 F.4th 1358, 1363 (Fed. Cir. 2022). "Moreover, any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (internal quotation marks omitted).

### 1. The District Court Erred in Determining that the "Only One Option" Language is Unclear Because it Could Purportedly Refer to a Gesture or a Function.

#### a. The District Court Failed to Correctly Apply the *Nautilus* Standard to Samsung's "Three Meanings" Argument.

The district court stated that "it is unclear to a POSITA whether the claim term 'only one option' refers to either a ***gesture*** or ***function*** . . . ." Appx0030 (emphasis in original). The court then concluded that "if the term 'option' does indeed refer to gestures or functions (rather than 'icons' or graphical user interface elements), then there are three equally competing interpretations of what this claim term means." Appx0031. The court here referred back to its summary of Samsung's argument, which posited three possible meanings for limitation 1[b]:

> (1) The representation represents a **single function** and there is only a **single option** to activate that function (e.g., only one specific input gesture will activate that function);
>
> (2) The representation may represent **multiple functions** but there is only a **single option** to activate one particular function (e.g., only one specific input gesture will activate one function, but a different input gesture activates a second function); and

> (3) The representation represents a **single function** and the claim allows **multiple options** to activate that function (e.g., any input gesture will activate that function).

Appx0024 (emphasis in original).

In arriving at its conclusion that Samsung's three alternative interpretations were "equally competing interpretations," the district court both failed to consider the **complete** intrinsic record and applied a test for indefiniteness that was expressly rejected by *Nautilus*.

First, the district court gave undue weight to the fact that "the word 'option' does not appear in the specification . . . ." Appx0029. The court reiterated this point three times. Appx0024 ("The word 'option' does not appear in the specification."); Appx0029 ("the word 'option' does not appear in the specification . . . ."); Appx0030 ("Again, the specification does not define 'option.'"). And the court made it clear that it considered the lack of an express definition of "option" to be the primary problem with the claim:

> As explained above, the word "option" does not appear in the specification (much less the broader phrase "only one option for activating the function"). Rather, the specification merely says that the menu area "'present[s] a representation' of a first, a second and a third function" ('879 patent at 2:5–7, 4:1–3)—without ever explaining what that representation consists of—and also says, "that any one of these three functions" "can be activated" when the touch sensitive area "detects a movement of an object" (id. at 2:10–14, 4:7–11)—without ever addressing the "only one option for activating the function" claim requirement.

Appx0029.

The district court's placement of dispositive importance on the absence of "option" from the specification was fundamentally flawed. There is no requirement that the claim language appear verbatim in the specification. *One-E-Way, Inc. v. International Trade Commission*, 859 F.3d 1059, 1062, 1064 (Fed. Cir. 2017) (reversing the ITC's determination of indefiniteness despite the fact that the challenged claim term was "not defined in the Asserted Patents" and was not found in the specification); *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) (noting that, "although the word 'engaging' is not expressly mentioned in the specification, figures 1 and 3 aid our understanding of that term."); *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) ("Hartford . . . point[s] out that the term surrender value protected investment credits' is not defined, ***or even used***, anywhere in the specification . . . . The failure to define the term is, of course, not fatal, for if the meaning of the term is fairly inferable from the patent, an express definition is not necessary . . . .") (emphasis added).

Similarly, there is no requirement that the specification expressly define a claim term. *Grace Instrument*, 57 F.4th at 1008 ("Further, to the extent Chandler would require an explicit definition of the term 'enlarged chamber,' that is incorrect."). The relevant inquiry is not whether "option" appears in the

specification, but rather whether a POSITA ***must have*** an express explanation of what the word means in order to understand claim 1 with reasonable certainty. Here there is no such need because, as shown in section VI(C) below, the intrinsic record provides sufficient guidance as to the meaning of limitation 1[b]. Indeed, the portions of the specification that the district court cited ***provide three examples of representations of functions that consist of only one option for activating an associated function at any given time***, i.e., elements 21–23. Appx0089, 2:5–14; Appx0090, 4:1–11; Appx0085, Fig. 1. Accordingly, the district court's erroneous requirement that the specification "address" or define "option" requires reversal.

Second, the district court's fixation on the absence of "option" from the specification also led it to erroneously privilege the specification over the prosecution file. While the court summarized the parties' arguments concerning the prosecution file, it failed to address them in any substantive way. Instead, the court simply assumed tautologically that Neonode's arguments were incorrect based on the absence of "option" in the specification:

> Again, the specification does not define "option." Although the Plaintiff cites the prosecution history for the notion that "option" does not refer to a gesture, the Court finds that it is unclear to a POSITA what the claimed "option" is.

Appx0030.

Other than by summarizing the parties' arguments, the district court failed to address the pertinent prosecution history, i.e., the applicant's argument ***distinguishing Hirshberg's multi-function keys based on the "only one option" claim amendment***, or the applicant's explanation of how the new language was supported by the specification's description of elements 21–23. Appx2941–2943. The prosecution file is, like the specification, part of the intrinsic record, and **must** be weighed appropriately in addressing an indefiniteness argument or construing a claim. The court's failure to do so constitutes reversible error. *Nature Simulation Systems*, 50 F.4th at 1367 (reversing the district court's conclusion of indefiniteness, noting that "[t]he district court gave no weight to the prosecution history showing the resolution of indefiniteness by adding the designated technologic limitations to the claims."); *Nevro Corp. v. Boston Scientific Corp.*, 955 F.3d 35, 41 (Fed. Cir. 2020) (vacating the district court's determination of indefiniteness in part based on the patentee's arguments distinguishing prior art during prosecution); *Personalized Media Communications, LLC v. Apple Inc.*, 952 F.3d 1336, 1345–46 (Fed. Cir. 2020) (reversing the Board's claim construction: "an applicant's amendment accompanied by explanatory remarks can define a claim term where, as here, the claim language and specification fail to provide meaningful guidance."); *One-E-Way,* 859 F.3d at 1064–66 (reversing the ITC's determination of indefiniteness in part based on the applicant's explanation distinguishing the prior art from a phrase similar to the

phrase at issue); *All Dental Prodx, LLC v. Advantage Dental Products, Inc.*, 309 F.3d 774, 779–80 (Fed. Cir. 2002) ("In this case, the prosecution history aids in clarifying the meaning of the claim phrase 'original unidentified mass.'").

Third, the district court compounded its error by examining "only one option" in isolation, rather than in the context of claim 1 as a whole. "[T]he dispositive question in an indefiniteness inquiry is whether the ***'claims,' not particular claim terms***, 'read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" *Cox Commc'ns, Inc.*, 838 F.3d at 1231 (emphasis added) (quoting *Nautilus*, 572 U.S. at 901); *Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326, 1333 (Fed. Cir. 2022). ("Proper claim construction 'demands interpretation of the entire claim in context, not a single element in isolation.'") (quoting *Pause Technology, LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005)). The court's opinion is devoid of any indication that it attempted to construe limitation 1[b] within the context of the claim as a whole rather than as an isolated element. The district court's failure to analyze indefiniteness of the claim, rather than of the phrase "only one option" in isolation and out of context, constitutes yet another instance of reversible error. *University of Massachusetts v. L'Oréal S.A.*, 36 F.4th 1374, 1379 (Fed. Cir. 2022) ("'Extracting a single word from a claim divorced

from the surrounding limitations can lead construction astray.'") (quoting *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011)).

Finally, the district court erred by implicitly adopting a "differing interpretations" test that was expressly rejected by *Nautilus*. The "test is not merely whether a claim is susceptible to differing interpretations." *Nevro*, 955 F.3d at 41. As this Court has explained:

> Such a test would render nearly every claim term indefinite so long as a party could manufacture a plausible construction. In fact, the Supreme Court declined to adopt such a rule in *Nautilus*. *Id.* at 909, 134 S.Ct. 2120 (declining to adopt a test rendering a patent invalid "when a claim is 'ambiguous, such that readers could reasonably interpret the claim's scope differently'").

*Id.* (reversing district court ruling that found the term "configured to" indefinite because it was susceptible to more than one interpretation)*; see also ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1351 (Fed. Cir. 2022) ("ClearOne's arguments for indefiniteness merely identify different ways one could interpret self-similar. Just because a term is susceptible to more than one meaning does not render it indefinite."). Accordingly, it was not sufficient for the district court to simply point to Samsung's three purported alternative interpretations of limitation 1[b] and conclude with no explanation that these were "equally competing interpretations." The court was obligated to determine whether the claims, "viewed in light of the specification and prosecution history, 'inform those skilled in the art

about the scope of the invention with reasonable certainty.'" *Nevro*, 955 F.3d at 41 (quoting *Nautilus*, 572 U.S. at 910). The court's single-sentence conclusory explanation reflects that it failed to do so here, instead adopting the "differing interpretations" approach rejected by *Nautilus*, *Nevro* and *ClearOne*.

Applying the *Nautilus* standard correctly, none of Samsung's proposed alternative meanings are supported by the intrinsic record. Accordingly, the district court erred in determining that there is "no informed and confident choice" that is available between Samsung's unsupported interpretations and the well-supported construction proposed by Neonode (addressed in section VI(C) below).

**b. Samsung's "First Meaning."**

Samsung's proposed "first meaning" is: "[t]he representation represents a **single function** and there is only a **single option** to activate that function (e.g., only one specific input gesture will activate that function)." Appx0024 (emphasis in original). As summarized by the district court, Samsung argued that "the claim language supports meaning (1) because the claim recites 'the function' (in the singular) and a POSITA could read that language as referring to a single function; and (b) a POSITA could read the 'only one option' language to require that only one specific gesture may activate the one function." Appx0025. The intrinsic record is devoid of any support for this proposed interpretation.

### i "Single Function."

First, the claim language forecloses Samsung's assertion that the recited representation represents a single function. Claim 1 recites:


The invention claimed is:

1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.



Appx0091; Appx1060.

The recitation of "**a** representation" of "**a** function" in limitation 1[a] carries a strong presumption that the claim covers "one or more representations" of "one or more functions." *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) ("As a general rule, the words 'a' or 'an' in a patent claim carry the meaning of 'one or more.' The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'") (quotations and citations omitted); *TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008); *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016). And the use of "**the** function" in limitation 1[b] connotes "the one

or more" functions of limitation 1[a]. *01 Communique*, 687 F.3d at 1297. So, limitation 1[b] does not limit the "representation" to representing only a single function.

Notably, the district court acknowledged this rule of construction twice, in summarizing Samsung's argument for its "second meaning," Appx0025, and in summarizing Neonode's argument. Appx0028. Yet the court failed to apply the rule or to explain why it failed to do so. This is particularly troubling in light of the fact that this rule eliminates the first of Samsung's three purported interpretations (as well as the third interpretation, as will be discussed below).

Second, Samsung asserted that in the Google IPR Neonode tied "the representation" to a single function, positing that this purported argument "created further uncertainty about what the claim means . . . ." Appx0215. The district court noted Samsung's assertion that Neonode's IPR argument "increased uncertainty about this claim," Appx0026–0027, but did not reference Neonode's response to this argument, explain why (or even whether) it accepted Samsung's characterization of this portion of the IPR record, or explain how this was relevant to its indefiniteness analysis. In any event, Samsung's characterization of Neonode's IPR arguments is wrong—Neonode never argued that the representation is limited to a single function.

The complete IPR record belies Samsung's assertion that Neonode tied "the representation" to a single function. Google asserted in the IPR that "Neonode's

position [required] 'that the representation represents *only one function*,'" and contended that that position contradicted the specification's disclosure concerning representation 21 (the application dependent function). Appx2025 (emphasis in original). Neonode responded that Google's characterization of its argument was incorrect:

> Neonode does not argue that the representation must represent 'only one function.' Rather, Neonode argues that ***even if the representation may represent different functions*** depending on the context, the user is provided with ***only one option on what action to initiate*** in that context.

*Id.* Neonode then pointed to the specification's teaching that "'the first function 21' is application dependent and may represent different functions depending on the context," and explained:

> However, the user is not provided with those different options to choose from; rather, as the user "glide[s] ... away," there is only a single option with respect to the representation of the function in a particular context regardless of the direction of "gliding."

Appx2026. So, Neonode explained that limitation 1[b] did ***not*** limit the "representation" of claim 1 to representing a single function. Rather, limitation 1[b] limited the representation to providing a user with only one option as to what to activate by interacting with the representation, regardless of how many functions might be associated with the representation.

Consistent with this, Neonode argued at the IPR hearing that, while "a representation can at different times have multiple functions," at any given time "the user is given only one option in terms of what to activate and what option to take." Appx2056, 73:1–6, 13–16. Neonode was very clear on this point:

> But we are not arguing that the representation must only have one function. That's not what we're arguing. So if Your Honors would go to Slide No. 65.
>
> Petitioner is correct insofar as, in the specification, a representation can at different times have multiple functions. Yes.

Appx2055–2056, 72:23–73:3. Slide 65 of Neonode's demonstrative exhibits, to which Neonode directed the PTAB judges, made the same point:



Appx2123; Appx1096–1097, ¶ 52. Neonode's focus during the Google IPR was, thus, not on how many functions a representation represents, but on how many functions could be activated at any given time (only one).

Accordingly, Neonode's position in the IPR was clear and consistent with its position in the district court—a representation may represent more than one function, but always provides only one option as to what function to activate any given time. There is no support in the intrinsic record for Samsung's contention that limitation 1[b] could be interpreted to limit the claim to a single function per representation. This on its own is sufficient to eliminate Samsung's "first meaning."

**ii "One Specific Gesture."**

The second aspect of Samsung's "first meaning" is that "only one specific input gesture will activate that function." Appx0024. Here again, the intrinsic record precludes Samsung's proposed interpretation.

First, the claim language forecloses Samsung's contention that the "only one option" language limits the claim to "one specific input gesture." Limitation 1[b] recites that "***the representation consists of*** only one option for activating the function." Appx0091. When used within the body of a claim, "consists of" typically limits the clause for which it acts as a transition. *See Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1358-59 (Fed. Cir. 2016). Here, "consists of" as used in limitation 1[b] limits "the representation"—it states a

***characteristic*** of ***the representation***, not of the function or of how the function is activated. The specified characteristic is the number of options for activating a function, and the options are limited to one function that may be activated. "Consists of" does not limit *how* to activate the represented function—that is addressed in limitation 1[c], which does not limit claim 1 to "only one specific gesture." And limitation 1[c] recites the activation operation in open format: "wherein the function is activated by a multi-step operation ***comprising*** (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location." Appx0091. So, Samsung's construction would replace "the representation" of limitation 1[b] with "the gesture," and would create a direct conflict between "consists of" in limitation 1[b] and "comprising" in limitation 1[c]. Such a construction cannot be correct. *Pause Technology, LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) (rejecting a construction of a term that was inconsistent with other limitations of the claim because it would "impermissibly conflict[] with the plain meaning of the claim.").

Moreover, Samsung's own expert contradicted Samsung's assertion that "consists of only one option" limits "how a user interacts with the representation" when he testified that:

> a POSITA would typically ***not*** consider a representation as 'consist[ing]' of a user gesture or the software response

> to a user gesture. The gesture 'options' are manners in which a user may interact with the representation, and ***they would not be considered as part of the representation***.

Appx0252–0253, ¶ 42. To the extent that this Court considers extrinsic evidence helpful here, this admission confirms that limitation 1[b] is not amenable to Samsung's "first meaning."

Second, the prosecution file does not support limiting limitation 1[b] and claim 1 to "one specific gesture." When the applicant added limitation 1[b] to overcome Hirshberg, the applicant described Hirshberg as follows:

> To enter a character, a user first touches a key representing several characters, and then drags his finger in a specific direction to select one of the several characters. Thus, at par. [0055], Hirshberg recites:
>
>> In multi-function key [sic] the first touch on the key activate [sic] the key and the relative trace ... is selecting the appropriate function among the functions associated with the selected key.
>
> * * *
>
> Applicant respectfully submits that Hirshberg teaches a touch and glide operation only for keys that comprise several characters. On the contrary, <u>for single character keys Hirshberg teaches using a conventional touch operation without a glide</u> (Hirshberg/ pars. [0055] and [0074]).
>
> * * *
>
> In distinction, the claimed invention <u>uses a multi-step touch-and-glide operation for representations that consist of only one option for activating a function</u>.

Appx2941–2942 (emphasis in original). The applicant distinguished Hirshberg's multi-function keys, representing several characters, from single function/character keys. Hirshberg taught that each type of key had only a single type of input gesture that would activate a function: a touch-and-glide operation for multi-function keys and a touch operation for single function/character keys. Appx1242; Appx1256, ¶ 55; Appx1258, ¶ 74. The "only one option" language was added to distinguish the aspect of Hirshberg that offered multiple "options"—the multi-function keys activatable by a touch-and-glide operation. Appx2941–2942. Given that the touch-and-glide operation of limitation 1[c] was not amended, the only reasonable conclusion is that the "only one option" language was added in order to distinguish Hirshberg's multi-function keys by narrowing the claim to avoid representations that enable activation of multiple functions at a given time.

Moreover, the applicant's explanation of the support for the new claim language highlights that the amended language did not look to the type of gesture used to activate the function:

> Applicant notes that each representation 21 - 23, shown in FIG. 1 of the original specification, consists of only one option for activating its corresponding function. Indeed, element 21 ***consists of the one option of*** displaying icons as appropriate for a currently active application, as described at par. [0048] and shown in FIG. 3 of the original specification. Element 22 ***consists of the one option of*** opening a keypad and text window, as described at par. [0052] and shown in FIG. 5 of the original specification. Element 23 ***consists of the one option of***

> opening a list of computer system applications and files, as described at par. [0058] and shown in FIG. 6 of the original specification.

Appx2943 (underlining in original). Here, the applicant clearly expressed that "the option" of which a representation "consists" is the ability to activate a function corresponding to the representation. The applicant drove the point home in the next sentence: "Moreover, each of these ***one-option elements*** is activated by a multi-step touch-and-glide operation, as described at pars. [0016] and [0047] of the original specification." *Id.* The applicant thus differentiated the "option" from the activation gesture ("a multi-step touch-and-glide operation"). Nothing in this explanation looked to how many gestures are available to activate the functions. *Id.* To the contrary, the applicant's explanation looked to ***how many options*** for activating a function (one) were presented at a given time, and in each instance the "option" was described by reference to an activated function. That is the basis on which the applicant distinguished Hirshberg's multifunction keys, both in the amended claim language and in argumentation to the examiner.

Notably, the district court summarized the parties' acknowledgement that limitation 1[b] was added in order to overcome Hirshberg by distinguishing "the representation" of claim 1 from "the individual keys represented in Hirshberg [each of which] could perform multiple functions (i.e., the entry of different characters depending on what gesture the user performed on the key)." Appx0026. The district

court then noted Samsung's assertion, based on the first sentence in the text block quoted above, that the applicant's explanation of support for the amended language created an inconsistency because it "'appears to also assert there is only one option (***gesture***) to activate a representation's corresponding function.'" *Id.* (emphasis in original). The court did not, however, explain why (or even whether) it agreed with Samsung that the "option" referenced by the applicant refers to a "gesture." This failure is particularly troubling given that the following four sentences in the applicant's explanation make it clear that the "option" refers to the option of activating a function and not to a type of gesture. Appx2943.

Third, the district court noted Samsung's assertion that during the Google IPR Neonode had argued "that the 'one option' claim language relates to the correspondence between the representation and one function." Appx0027. Samsung contended that this alleged argument created an inconsistency with Neonode's argument that "the 'one-option limitation' should ***not*** be interpreted to 'require that each function associated with the representation of the function can be activated only by one gesture.'" *Id.* But there was no inconsistency, because Neonode never argued that the function could only be activated by a single gesture. During the Google IPR, Neonode characterized as "incorrect" the assertion that limitation 1[b] requires that "each function is activated by only a single gesture," both in the briefing, Appx0711, and in its demonstrative exhibits. Appx2119. In slide 61,

Neonode characterized as "incorrect" Google's interpretation of limitation 1[b] "to mean that each function is activated by only a single gesture:"




*Id.* Similarly, in slide 66, Neonode criticized as incorrect Google's position that "Hirshberg was distinguished because it activated the same function by multiple gestures:"




Appx2124. And at the IPR hearing, Neonode explained: "We are not proposing that the representation of a function can only be activated with one gesture." Appx2051, 48:2–5. So Neonode was very clear on this point. The district court never explained whether or how Neonode's IPR argument supports Samsung's assertion that a POSITA could interpret limitation 1[b] to require that "only one specific input gesture will activate that function." In fact, it does not.

In sum, the intrinsic record does not support the district court's conclusion that Samsung's "first meaning" was an "equally competing interpretation[] of what this claim term means." Appx0031.

### c. Samsung's "Second Meaning."

Samsung's proposed "second meaning" is: "The representation may represent **multiple functions** but there is only a **single option** to activate one particular function (e.g., only one specific input gesture will activate one function, but a different input gesture activates a second function)." Appx0024. Per the district court, Samsung argued that "the claim language supports meaning (2) because: (a) a POSITA recognizes the antecedent basis of 'the function' is 'a function' and knows the use of the 'a' could be read by a POSITA to permit one or more functions; and (b) a POSITA could read the 'only one option' language to require that only one specific gesture may activate any given function." Appx0025.

First, there is no support in the claim for Samsung's "second meaning." Even if "only one option" referred to a gesture (which it does not), the claim does not recite "only one option for activating ***<u>each of</u>*** the functions." In addition, the proposed limitation to one specific gesture per function creates an inconsistency with the "comprising" transition of limitation 1[c].

Second, the specification discloses nothing resembling Samsung's "second meaning." The specification teaches that general application dependent function 21 is activatable for different functions depending on the current active application, and that all of the functions potentially activatable via representation/element 21 are activated by the same gesture: a touch-and-glide operation starting at and gliding

away from the representation. Appx0085, Fig. 1–2; Appx0090, 4:1–12. Construing limitation 1[b] to require one specific gesture per function finds no support in the specification, and would exclude the preferred embodiment. Samsung's proposed construction is therefore presumptively incorrect. *E.g.*, *Adams Respiratory Therapeutics, Inc. v. Perrigo Co*., 616 F.3d 1283, 1290 (Fed. Cir. 2010) ("A claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.") (quotation omitted); *Primos*, 451 F.3d at 848 ("[W]e also should not normally interpret a claim term to exclude a preferred embodiment.").

Third, Samsung's "second meaning" could be understood to read onto Hirshberg, the very reference that limitation 1[b] was added to overcome. Each of Hirshberg's multi-function keys was associated with multiple functions (e.g., "A," "B," "C," "2,"), and each function was activatable by a specific trace across the key. Appx1242; Appx1256, ¶ 55. Accordingly, if "one specific gesture per function" were understood to map onto the specific "traces" disclosed by Hirshberg, Samsung's "second meaning" would appear to read directly onto Hirshberg. But limitation 1[b] was added in order to distinguish the claimed invention from Hirshberg's multi-function keys. Appx2941–2943. A construction that would map onto prior art distinguished during prosecution is typically not correct. *See Personalized Media*, 952 F.3d at 1345–46 (finding that the applicant's amendment

and explanatory remarks distinguishing the cited art "provides persuasive evidence that informs the meaning of the disputed claim phrase and addresses an ambiguity otherwise left unresolved by the claims and specification."); *Research Plastics v. Federal Packaging*, 421 F.3d 1290, 1297 (Fed. Cir. 2005) (rejecting construction that "would not avoid the prior art that Research distinguished" during prosecution). Accordingly, the prosecution file forecloses Samsung's "second meaning."

#### d. Samsung's "Third Meaning."

Samsung's proposed "third meaning" is: "The representation represents a **single function** and the claim allows **multiple options** to activate that function (e.g., any input gesture will activate that function)." Appx0024. As summarized by the district court, Samsung argued that "a POSITA could read the 'only one option' language as limiting 'the representation' to one function (rather than limiting the number of activating gestures), in which case the claim recites a single function that any input gesture may activate." Appx0025.

This interpretation is meritless for two reasons. First, as shown in section VI(B)(1)(b)(i) above, both the claim as a whole and the IPR record preclude limiting "the representation" to a single function. And Neonode repeatedly and consistently explained during the Google IPR that the "representation" of claim 1 is not limited to representing a single function. Second, as shown in section VI(B)(1)(b)(ii) above,

limitation 1[b] does not address the type or number of gestures that may activate a function.

#### e. The District Court's Unexamined Acceptance of Samsung's "Three Meanings" Argument Led it to Error.

The totality of the district court's analysis concerning Samsung's "three meanings" argument is a single sentence stating a conclusion: "As explained above in the summary of Samsung's argument, if the term 'option' does indeed refer to gestures or functions (rather than 'icons' or graphical user interface elements), then there are three equally competing interpretations of what this claim term means." Appx0031. The district court failed to provide any explanation at all as to why it found Samsung's argument so convincing as to overcome the presumption of validity.

Although the district court cited two cases in its "Analysis" section, it did not explain how they governed the court's analysis. Neither is on point. The first, *Interval Licensing LLC v. AOL, Inc*., 766 F.3d 1364, 1371 (Fed. Cir. 2014), involved a term of degree ("selectively display, **in an unobtrusive manner** …") that was "highly subjective and, on its face, provides little guidance to one of skill in the art." *Id*. at 1368, 1371 (emphasis in original). The specification was "at best muddled," and the prosecution file reflected "considerable uncertainty about which embodiments were tied to the 'unobtrusive manner' language." *Id*. at 1372, 1373.

This case in inapposite here. "[O]nly one option" is neither a term of degree nor subjective. The specification of the '879 Patent provides clear guidance as to the meaning of the term, including three examples (elements 21–23). The prosecution file explains exactly what the claim language was intended to accomplish. And, consistently with the specification and the prosecution file, the IPR record provides additional explanation as to the meaning of "only one option." *Interval Licensing* involved no similar facts.

The district court also cited *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015), which is similarly inapposite. There, this Court found the term "compliance mechanism" to be indefinite. The case involved a means-plus-function term involving computer-implemented functions, so this Court required "that the specification disclose an algorithm for performing the claimed function." *Id*. at 1374. Three of the four functions lacked a corresponding algorithm disclosed in the specification, so this Court found the claim to be indefinite. *Id.* at 1374–75. Here, claim 1 is not stated in means-plus-function format, so the district court was not bound to search the specification for corresponding structure as was the *Media Rights* court. The basis for the district court's indefiniteness ruling—that the claim language is purportedly subject to multiple "equally competing interpretations"—was not at issue in *Media Rights*.

The district court therefore failed to provide any real explanation as to its reasoning, failed to consider the complete intrinsic record, applied a "differing interpretations" test that was rejected by *Nautilus*, and relied on inapplicable authority. None of Samsung's "three meanings" reflects an acceptable construction under the *Phillips* standard, so none of them support the district court's conclusion that "there are three equally competing interpretations of what this claim term means." *ClearOne*, 35 F.4th at 1351 ("ClearOne's arguments for indefiniteness merely identify different ways one could interpret self-similar. . . . Because the intrinsic evidence informs, with reasonable certainty, skilled artisans about the scope of the invention, and because substantial evidence supports that scope, we affirm the Board's holding that claim 57 is not indefinite."). The claim is therefore not indefinite. This Court should reverse the judgment and remand for further proceedings.

**2. The District Court Erred in Determining that "Only One Option" Could Refer to "Presenting the User with an Icon."**

The district court also concluded that the "only one option" language was indefinite because it could refer to "***presenting* the user with *an icon***." Appx0030. The court did not arrive at this conclusion based on the claim language, specification, or prosecution record. Instead, the district court believed that Neonode had made the argument. Appx0030 ("Indeed, Neonode confirms that it is contending that the

claimed 'option' refers not to 'gestures' or 'functions,' but to what the patent describes as 'icons.'"). The court then rejected this purported argument, because:

> Critically, the patentee knew how to claim these graphical user interface elements—it called them "***icons***." By contrast, the patentee here used the term "***option***," and it is unclear to a POSITA (or this Court) whether "option" refers to a graphical user interface element, a gesture to activate the function, or even the function itself.

Appx0030–0031 (internal cites omitted). The district court's analysis and conclusion are erroneous for multiple reasons.

First, Neonode never argued that "option" refers to icons. Rather, Neonode argued that the "only one option" language of limitation 1[b] is directed not to whether a representation consists of an icon or some other type of representation, but to "activating" a function. Appx1059–1066.

In support of its mistaken understanding of Neonode's argument, the district court cited the following—emphasis by the court, not Neonode:

> See ECF No. 81 at 8 ("The applicant's reliance on representation 21—corresponding to an 'application dependent' function that can cause the display to present different sets of icons to the user depending on context, such as whether a currently active application is running—***makes it clear*** that the representation ***presents one option*** for activating a function at any given time (***e.g., displaying icons*** as appropriate for a currently active application.") (emphasis added).

Appx0030 (emphasis in original).

The quoted content does not support the district court's mischaracterization of Neonode's argument, and is not even quoted correctly. In the quoted sentence, Neonode was not arguing that the claimed "option" refers to icons, but rather that the applicant's description of support for the newly added "only one option" language indicated that limitation 1[b] addresses ***how many*** functions could be activated ***at any given time*** rather than ***how*** a function is activated. Appx1061–1063. A complete and accurate quote makes this clear:

> The applicant's description of the support for "only one option" confirms this. The applicant explained that the specification discloses that each of representations 21-23 "consists of the one option of" activating a corresponding function. The explanation did not look to ***how*** the functions were activated, but rather to ***how many*** functions could be activated at a given time. Ex. 4 at 208. The applicant's reliance on representation 21—corresponding to an "application dependent" function that can cause the display to present different sets of icons to the user depending on context, such as whether a currently active application is running—makes it clear that the representation presents one option for activating a function ***at any given time*** (*e.g.*, "displaying icons as appropriate for a ***currently active*** application."). *Id.*; *see also id.* at 427 ("***At any given time***, may be used for activating whichever function is touched, from among a plurality of functions." (emphasis added)). The final sentence of the explanation, in which the applicant characterized representations 21-23 as "these one-option elements" ***before*** stating that they were activated by a touch-and-glide operation, reinforces that "only one option" addresses ***how many*** functions could be activated at any given time rather than ***how*** a function is activated.

Appx1062–1063. The focus of this paragraph is that limitation 1[b] addresses ***how many*** functions could be activated and that the limitation requires the representation to present only one option for activating a function ***at any given time***. The district court's attribution to Neonode of an entirely different argument concerning "icons," based on its reading of one sentence plucked out of context and given an entirely different emphasis, highlights the fact that the district court never addressed the arguments that Neonode actually made.

Moreover, the content quoted by the district court does not even refer to the "option" as icons. The icons referenced in the quote are displayed ***after*** a function has been activated by touching and gliding away from a representation of a function (representation 21). They are the ***result*** of activating a function, not ***the representation*** of the function ***to b***e activated. The quote that the district court cited actually highlighted that the applicant's reliance on representation/element 21—which represented an "application dependent function" that could yield a different result upon activation based on the currently active application—"makes it clear that the representation presents one option for activating a function ***at any given time***." Appx1062–1063. Neonode never equated "option" with icons.

Even though Neonode did not argue that "only one option" means "only one icon," the district court proceeded as if that were Neonode's argument, rejecting it because the patentee used the term "icons" in other claims and then moving

immediately to the conclusion that "option" renders claim 1 indefinite. Appx0030. The district court considered its rejection of Neonode's purported "icons" argument to be "critical[]" to its analysis. Appx0030. The court's erroneous attribution to Neonode of an argument it never made, coupled with its failure to substantively address any of the arguments that Neonode actually did make, was prejudicial. As shown in section VI(C) below, Neonode's claim construction arguments—which the district court either misunderstood or ignored—are well-supported by the intrinsic record.

Second, the intrinsic record does not support the district court's conclusion that "it is unclear to a POSITA whether the claim term 'only one option' refers to … ***presenting* the user with *an icon*** . . . ." Appx0030 (emphasis in original). Neither Neonode nor Samsung made this argument, and the district court cited nothing in the claim, the specification or the prosecution file supporting its conclusion.[4] Indeed, the district court's conclusion that this purported "icons" argument is wrong indicates that a POSITA would ***not*** have read the "only one option" language to refer to presenting the user with an icon, and would not have been confused as to this issue. The district court's failure to resolve, or even evince awareness of, this inconsistency in its reasoning mirrors the other deficiencies in its analysis.

[4] The same is true with respect to "graphical user interface elements," which the district court conflated or grouped with icons later in its opinion. Appx0030–0031.

### 3. The District Court Overlooked Dr. Rosenberg's Declaration, Which Confirms That a POSITA Would Understand the Meaning of Limitation 1[b] with Reasonable Certainty.

When, as here, "the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence" such as expert testimony. *Grace Instrument*, 57 F.4th at 1008 (quotes omitted). But should this Court consider the extrinsic record, it both supports Neonode's claim construction and reveals an additional error by the district court.

Neonode submitted a 44-page declaration from its expert, Dr. Rosenberg, with its initial claim construction brief, 15 pages of which were devoted to explaining how a POSITA would understand limitation 1[b] and why claim 1 is not indefinite. Appx1077–1082; Appx1088–1103. The declaration was the first attachment to Neonode's opening brief. Appx0081 (Dkt. No. 81, Attachment #1); Appx1077. Neonode cited to this declaration on nearly every page of its opening brief addressing the meaning of limitation 1[b].[5] Appx1059–1061; Appx1063–1068; Appx1070–1074. Yet, ***the district court was unaware that Neonode had even submitted this evidence***. Appx0020 ("Neonode does not rely on an expert for its claim construction briefing.").

---

[5] The references in Neonode's Opening Claim Construction Brief to "Ex. 24" refer to Dr. Rosenberg's declaration, even though the declaration, which was properly attached as an exhibit to the brief, was not explicitly labeled "Exhibit 24." Each citation contains references to specific paragraphs to Rosenberg's declaration.

The Rosenberg declaration responded to the declaration of Dr. Cockburn, Samsung's expert. Regarding limitation 1[b], the Cockburn declaration consisted of legal argument and a few conclusory assertions. Dr. Rosenberg, in response, principally addressed how a POSITA would understand the intrinsic record, and then rebutted Dr. Cockburn's conclusions. Among other things, Dr. Rosenberg explained how a POSITA would understand the claim as a whole, the teaching of the specification, and the prosecution file. Appx1088–1094, ¶¶ 35–47. He reviewed Dr. Cockburn's assertion that Neonode took inconsistent positions during the Google IPR and explained why that assertion is incorrect. Appx1095–1099, ¶¶ 48–56. Dr. Rosenberg showed that Dr. Cockburn's opinions were based on mischaracterizations of the IPR record—including "interpreting" statements in Dr. Rosenberg's IPR declaration out of context and contrary to their clear meaning—and ignored the arguments that Neonode actually made during the IPR. Appx1095–1099, ¶¶ 51–54. Dr. Rosenberg then evaluated Dr. Cockburn's assertion that limitation 1[b] could have any of the "three meanings" ascribed to it by Samsung, and explained why a POSITA would not understand the claim in the manner proposed by Samsung and Dr. Cockburn. Appx1100–1001, ¶¶ 57–61. He also addressed several spurious questions posed by Dr. Cockburn, none of which suggested a lack of clarity in light of the intrinsic record. Appx1101–1103, ¶¶ 62–65.

Neonode does not believe that resort to extrinsic evidence is necessary here, given the sufficiency of the intrinsic record. But the district court's failure to consider Dr. Rosenberg's declaration—due to its lack of awareness that the declaration had even been filed—reflects yet another error and exemplifies the deficiencies in the district court's indefiniteness analysis.

### C. The Intrinsic Record Supports Neonode's Plain Meaning Construction of Limitation 1[b].

The district court did not construe limitation 1[b]. It should have done so, even if it found the task challenging, because the intrinsic record provides sufficient guidance as to the meaning of the claim. *Funai Elec. Co. v. Daewoo Electronics Corp.*, 616 F.3d 1357, 1372 (Fed. Cir. 2010) ("An ungainly claim is not thereby indefinite, when its meaning can be understood by a person experienced in the field of the invention, on review of the patent documents.").

Rather than return this case to the district court for another round of claim construction, Neonode respectfully requests that this Court construe the limitation now. *See Nevro*, 955 F.3d at 42 (construing "configured to" after concluding that the district court had erred in finding the term indefinite). *Phillips* requires consideration of the entire intrinsic record, including the prosecution file, in construing a claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311–17 (Fed. Cir. 2005). In light of the complete intrinsic record, limitation 1[b]'s meaning can be

determined with reasonable certainty: ***the representation consists of only one option for activating one of the one or more functions at any given time***.

### 1. The Claim Supports a Plain Meaning Construction of Limitation 1[b].

The words of a claim are generally given their ordinary meaning, within the context of the claim as a whole. *Lexion Medical, LLC v. Northgate Technologies, Inc*., 641 F.3d 1352, 1356 (Fed. Cir. 2011); *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc*., 334 F.3d 1294, 1299 (Fed. Cir. 2003).

The structure and content of claim 1 provide substantial guidance as to the meaning of the claim. Claim 1 recites:


The invention claimed is:
1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.


Appx0091; Appx1060.

Limitation 1[a] recites "a representation of a function." Limitation 1[b] states ***a characteristic of*** that representation ("the representation consists of . . .") in terms

of what the representation enables ("only one option for activating the function"). Limitation 1[c] recites ***how the function is activated***.

As addressed in section (VI)(B)(1)(b)(i) above, "the function" of limitation 1[b] connotes "the one or more" functions of limitation 1[a]. *01 Communique Lab.*, 687 F.3d at 1297; *TiVo,* 516 F.3d at 1303; *Convolve,* 812 F.3d at 1321. And "**the representation** **consists of** only one option" states a ***characteristic*** of ***the representation***. It does not state a characteristic of any represented function (i.e., "the **function** consists of") or of how any function is activated. The specified characteristic is the number of options for activating a function that are provided by the representation. The "representation" may represent more than one "function"—as illustrated by element 21 of the specification, which represents multiple possible functions depending on the active application—but limitation 1[b] narrows the claim such that the representation presents to the user only one option for activating one of those functions at any given time.

### 2. The Specification Supports a Plain Meaning Construction of Limitation 1[b].

The specification "is always highly relevant to the claim construction analysis." *Phillips*, 415 F.3d at 1315 (quotation omitted). Here, the specification discloses an embodiment with a user interface with an area that presents representations of functions 21–23, which can be activated by a touch and glide operation, just as in claim 1:




Fig. 1.




Fig. 2.

Appx0085, Figs. 1–2; Appx0090, 4:1–12. These represent, respectively, a "general application dependent function," a keyboard function, and a task and file manager function. Appx0090, 4:1–7. Elements 21–23 are examples of the "representations" recited in claim 1, which the specification depicts as graphical elements on the touch sensitive display. Appx0085, Fig. 1; Appx0090, 4:1–7.

Accordingly, the specification illustrates and explains the representations recited in limitations 1[a] and 1[b]—graphical elements 21–23 depicted in Figure 1, representing functions 21–23. Each of elements 22–23 represents only a single function, and accordingly consists of only a single option for activating an associated function. Conversely, element 21, which activates an "application dependent function," represents multiple possible functions depending on whether an application is active when the user interacts with the representation. For example,

if a camera application is active when the user interacts with element 21, then one set of icons will be displayed, Appx0090, 4:24–28, but if a word processing application is active, then a different set of icons will be displayed. In either case, only one function may be activated by interacting with the representation at any given time. Each of elements 21–23 and their associated functions is an example of what is recited in limitation 1[b].

Moreover, while the intrinsic record is sufficient to apprise a POSITA of the meaning of limitation 1[b] with reasonable certainty, it is notable that Dr. Cockburn, Samsung's expert, opined as to the teaching of the specification in similar terms:

> The specification also ***does not limit a "representation of a function" to only one function***, teaching instead that representation of function 21 corresponds to a specific function when no application is active, and, if an application is active, a function particular to that application. Id. at 4:7-15, 4:29-33. Thus, the only relevant disclosure that can be gleaned from the specification is that ***"any one" function*** (as opposed to multiple functions) might be activated through a gesture . . . .

Appx0255–0256, ¶ 45 (emphasis added). Here Dr. Cockburn acknowledges that the specification teaches that a representation is not limited to only one function and that one of the represented functions may be activated at a time, consistent with Neonode's proposed "plain meaning" construction.

### 3. The Prosecution File Supports a Plain Meaning Construction of Limitation 1[b].

"The prosecution history, in particular, may be critical in interpreting disputed claim terms because it contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Personalized Media*, 952 F.3d at 1340. Accordingly, "even where prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction." *Id.* "[A]n applicant's amendment accompanied by explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment." *Id.*

Here, the prosecution file is particularly important, as the applicant explained exactly why limitation 1[b] was added to the claim and what it was intended to accomplish. As shown above, limitation 1[b] was added to overcome Hirshberg. In response to the rejection over Hirshberg, the applicant explained that Hirshberg disclosed: (1) ***multi-function keys*** presenting ***multiple options*** for activatable functions, in which a function to activate was selected by a directional touch and glide operation; and (2) keys presenting only a single function for activation, which were activatable by a touch operation. Appx2941–2942. To overcome the rejection, the applicant added the "only one option" language, which narrowed claim 1 to a combination that was not disclosed by Hirshberg: a representation that presents ***only one option*** for activating a function at any given time ("the representation consists

of only one option for activating a function"), which function is activatable by a touch and glide operation. Appx2935.

The applicant's description of the support for the new "only one option" language confirms this:

> Applicant notes that each representation 21-23, shown in FIG. 1 of the original specification, consists of only one option for activating its corresponding function. Indeed, element 21 ***consists of the one option of*** displaying icons as appropriate for a currently active application, as described at par. [0048] and shown in FIG. 3 of the original specification. Element 22 ***consists of the one option of*** opening a keypad and text window, as described at par. [0052] and shown in FIG. 5 of the original specification. Element 23 ***consists of the one option of*** opening a list of computer system applications and files, as described at par. [0058] and shown in FIG. 6 of the original specification. Moreover, each of ***these one-option elements*** is activated by a multi-step touch-and glide operation, as described at pars. [0016] and [0047] of the original specification.

Appx2943 (emphasis added; underlining in original). By use of the phrase "the one option **of**" displaying icons, opening a keypad, or opening a list of applications and files, the applicant made clear that ***the "option" is the option of activating a function***. The usage of "option" here parallels the use of the term in Hirshberg, which discloses "selecting one of several options" for characters on a multi-function key, where the "option" is the option to activate a particular function depicted on the key (for example, "A," a "B," "C," or "2"). Because the claim specifies that "the

representation consists of only one option for activating the function," the representation enables the activation of only one function.

In addition, the applicant's explanation is consistent with the teaching of the specification that the representation consists of only one option for activating the function ***at any given time***. The applicant pointed to element 21 as support for the new language. Appx2943. Element 21 represents "general application dependent function" 21. Appx0090, 4:1–7. If this function is activated, the touchscreen will display icons "representing services or functions depending on the current active application." *Id.*, 4:13–28. Alternatively, if no application is currently active, the screen will display icons for services or settings of the operating system. *Id.*, 4:29–33. So, while element 21 may represent different functions depending on what application is then active, it provides only one option for activating a function at any given time.

Accordingly, even were the claim and the specification silent as to the meaning of limitation 1[b], which they are not, the applicant's amendment and remarks accompanying the amendment inform, with reasonable certainty, those skilled in the art as to the meaning of limitation 1[b] and the scope of the invention. This Court's recent opinion in *University of Massachusetts* is instructive. In *University of Massachusetts*, the district court found that the phrase "wherein the adenosine concentration applied to the dermal cells is $10^{-4}$ M to $10^{-7}$ M" rendered

the challenged claim indefinite. *Univ. of Massachusetts*, 36 F.4th at 1377. According to the district court, this "wherein" clause referred to an adenosine concentration applied to the dermal cells, i.e., below the epidermis, which was inconsistent with a prior clause reciting "topically applying to the skin a composition comprising a concentration of adenosine." *Id.* at 1377–78. This Court reversed. First, the Court noted that "the relevant claim language, especially when viewed in the context of the whole claim, is not plain on its face." *Id.* at 1379. But the Court found that "[e]ven more strongly than the specification, the prosecution histories of the patents in question resolve the ambiguity surrounding the meaning of 'the adenosine concentration applied to the dermal cells' in the wherein clause." *Id.* at 1379, 1382. The applicant added the "wherein" clause in order to overcome a prior art rejection, importing a dependent claim that had recited the adenosine concentration without reference to dermal cells, and explaining that the amendment "'*merely includes a range of concentrations of adenosine recited in dependent claims*.'" *Id.* at 1382 (emphasis in original). The applicant went on to distinguish two additional prior art references by comparing the adenosine concentrations in the prior art references with the claimed range, with no suggestion of a difference in the location where the concentration was measured. *Id.* This Court found that "this prosecution history requires that the wherein clause's reference to the recited concentrations being 'applied to the dermal cells' be read as referring to

concentrations of the composition applied to the skin's surface," which brought the "wherein" clause into harmony with the "topically applying" limitation, eliminating the alleged indefiniteness. *Id.* at 1382–83. Similarly, here, the prosecution file (as well as the rest of the intrinsic record) resolves any alleged ambiguity concerning the meaning of limitation 1[b].

*One-E-Way* is similarly instructive. In *One-E-Way*, the International Trade Commission determined that the term "virtually free from interference" was indefinite. *One-E-Way,* 859 F.3d at 1063. This Court reversed, because the specification and prosecution file supported the patentee's proposed construction of the phrase as "prevent[ing] one user from eavesdropping on another." *Id.* at 1063–64. During prosecution of a related parent application, the applicant had distinguished an asserted reference on the ground that it did not teach a system "where *interference is virtually eliminated (e.g., where eavesdropping cannot occur)* . . . ." *Id.* at 1065 (emphasis in original). This Court determined that a POSITA "would have found this statement in the prosecution history instructive," in part because "the very language of the prosecution history statement employs the term 'virtually.'" *Id.* Here, as in *One-E-Way*, the prosecution file provides substantial guidance as to the scope of limitation 1[b], and does so using the very term ("option") the district court concluded renders claim 1 indefinite.

*Personalized Media* also provides useful guidance. That case involved an appeal from an IPR FWD finding all challenged claims unpatentable. The primary issue on appeal was whether the claim term, "an encrypted digital information transmission including encrypted information," was limited to digital information. *Personalized Media*, 952 F.3d at 1340.[6] This Court found both parties' proposed constructions "equally plausible in view of the claim language" and concluded that "the evidence from the specification also fails to resolve the scope of the disputed claim term." *Id*. at 1342–43. During prosecution, the applicant had added the "encrypted digital" modifier to the claim, explaining that the cited art "*does not teach the encryption of an entire digital signal transmission*." *Id*. at 1345 (emphasis in original). Although the Board had discounted this evidence because the applicant's statements "did not constitute a clear and unmistakable surrender sufficient to rise to the level of disclaimer," this Court concluded that the applicant's prosecution argument, "along with its amendment to the same effect, are decisive as to the meaning of the disputed claim term—even if those statements do not rise to the level of a disclaimer." *Id*. at 1346.

---

[6] In *Personalized Media* this Court applied the "broadest reasonable interpretation" standard because the IPR at issue was filed prior to the date on which the Board began applying the *Phillips* claim construction standard. Under either standard the entire intrinsic record, including the prosecution file, must be considered. *Id*. ("the Board's interpretation must be reasonable in light of the specification, prosecution history, and the understanding of one skilled in the art.).

Here, as in *University of Massachusetts*, *One-E-Way* and *Personalized Media*, the applicant's remarks accompanying its amendment resolve any lingering ambiguity, making clear that the "option" is the option of activating a function, and does not refer to how many functions may be represented or how the function is activated.

#### 4. The IPR Record Supports a Plain Meaning Construction of Limitation 1[b].

Statements made by a patent owner during an IPR proceeding can be considered for claim construction. *Sequoia Technology, LLC v. Dell, Inc.*, 66 F.4th 1317, 1327 (Fed. Cir. 2023). Here, Neonode's arguments during the Google IPR bolster its proposed construction.

In the Google IPR, Google asserted that claim 1 was rendered obvious by, *inter alia*, the combination of Robertson and Maddalozzo. Appx1268. Neonode responded that Robertson failed to disclose multiple elements of claim 1, including limitation 1[b]. Appx0709–0713. Neonode explained that limitation 1[b] was added in order to overcome Hirshberg, which disclosed multi-function keys in which "the representation of the function (the soft key) provides the user with multiple options on what action to take depending on the input gesture." Appx0709–0710. Neonode explained that by adding limitation 1[b], "the Applicant required that there be only a single option with respect to the representation of the function regardless of the direction of 'gliding ... away.'" Appx0711.

Neonode then explained that Google applied "an ***incorrect understanding*** of the one-option limitation," interpreting "the one-option limitation to require that each function associated with the representation of the function can be activated only by ***one gesture***." *Id.* (emphasis added). Stressing that this understanding was "incorrect," Neonode argued that "Robertson is just like Hirshberg in that it provides the users with ***multiple options*** to choose from in terms of ***what to activate*** in the key depending on the input gesture." Appx0711–0712 (emphasis added). Neonode then cited to the IPR declaration of Dr. Rosenberg, in which he explained, *inter alia*, that:

> Robertson's XButton provides the users with multiple options to choose from for ***what action to activate***, depending on the gesture applied to the XButton ….
>
> ***
>
> In this respect, Robertson is just like Hirshberg, and the claims of the '879 were amended with the one-option limitation to distinguish the '879 from Hirshberg. Specifically, just as each of Hirshberg's soft keys depicted multiple distinct letters and provided the user with the option of which letter to choose from depending on the input gesture, Robertson similarly provides the user with several options of ***which action to activate*** with a given XButton depending on the input gesture. Therefore, a POSITA would understand that Robertson fails to disclose the one-option limitation.

Appx0712 (emphasis added); Appx2237; Appx2289–2290, ¶¶ 107–109. So, consistent with the arguments made during prosecution, Neonode explained that limitation 1[b] limited the claim to only a single option in terms of ***what to activate***.

### 5. The Intrinsic Record Supports Neonode's Construction.

As shown above, the complete intrinsic record amply supports Neonode's proposed construction of limitation 1[b]. The claim recites a touch-sensitive display in which a representation of one or more functions is provided, wherein ***the representation*** consists of only one option for activating the one or more represented functions. The specification teaches an example of exactly such a display, with elements 21–23 of the display, each of which consists of the ***one option*** of activating a specified function at any given time. The prosecution file shows that the "only one option" language of limitation 1[b] was added in order to distinguish multifunction keys in which a representation presented "several options" for functions that could be selected, and the applicant gave three examples from the specification of representations that "consist[] of the one option of" activating a specified function. And the IPR record indicates that the "option" is an option to activate one of one or more functions. The intrinsic evidence informs a POSITA that limitation 1[b] carries its plain meaning, which is ***the representation consists of only one option for activating one of the one or more functions at any given time***.

## VII. <u>CONCLUSION</u>

The district court failed to analyze the complete intrinsic record, as required by *Nautilus* and *Phillips*. Instead, it focused on one fact—that the word "option" is absent from the specification—and jumped to the conclusion that a POSITA could

not discern the meaning of the "only one option" language of limitation 1[b]. The district court's analysis was flawed, and its conclusion was erroneous. The intrinsic record provides ample support for Neonode's proposed construction. This Court should reverse the district court's judgment of invalidity, adopt Neonode's construction of limitation 1[b], and remand for further proceedings.

Dated: December 18, 2023

/s/ Philip Graves
Philip Graves
Greer Shaw
GRAVES & SHAW LLP
355 S. Grand Ave., Suite 2450
Los Angeles, CA 90071ff
(213) 204-5101

Brian D. Melton
Bryce Barcelo
Rocco Magni
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 653-7825

Kalpana Srinivasan
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100

*Counsel for Appellant*
*NEONODE SMARTPHONE LLC*

# Addendum

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **NEONODE SMARTPHONE LLC,**<br>*Plaintiff,*<br><br>v.<br><br>**SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG ELECTRONICS AMERICA, INC.,**<br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **6:20-CV-00507-ADA** |

**<u>FINAL CLAIM CONSTRUCTIONS OF THE COURT</u>**

The Court provided preliminary claim constructions on July 6, 2023, for U.S. Patent No. 8,095,879 ("'879 patent"). The Court held a claim construction hearing on July 7, 2023, in which the Court heard argument on the following claim terms: (1) "the representation consists of only one option for activating the function" and (2) the "gliding" terms. After careful consideration of the parties' briefs, oral argument, and the applicable law, the Court enters its final constructions for each term as shown below.

| Claim Term | Court's Final Construction |
|---|---|
| **"the representation consists of only one option for activating the function"**<br>'879 Patent Claims 1. | Indefinite |

| Claim Term | Court's Final Construction |
|---|---|
| **"gliding"** (claims 1, 12) / **"the object gliding along the touch sensitive area"** (claim 1) / **"gliding the object along the touch sensitive area"** (claim 12) | Plain and ordinary meaning, not including dragging, flicking, or a drag and drop operation |

**SO ORDERED AND SIGNED** this 14th day of July, 2023.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **NEONODE SMARTPHONE LLC,** *Plaintiff,* -v- **SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG ELECTRONICS AMERICA, INC.,** *Defendants.* | § § § § § § § § § § § | **6:20-CV-507-ADA** |

**MEMORANDUM IN SUPPORT OF CLAIM CONSTRUCTION ORDER**

Before the Court are the parties' claim construction briefs. Plaintiff Neonode Smartphone LLC (hereinafter "Neonode") submitted its Complaint for Patent Infringement on June 8, 2020 (ECF No. 1). Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Samsung") submitted the opening Markman Brief on April 14, 2023, and the Reply Markman Brief on June 9, 2023. (ECF Nos. 71, 84, respectively). Neonode submitted its response on May 19, 2023, and sur-reply brief on June 22, 2023 (ECF Nos. 81, 86, respectively). The Court held the Markman hearing on July 7, 2023. ECF No. 93. The Court provides this memorandum in support of its Claim Construction Order, and hereby incorporates-by-reference the claim construction hearing and transcript as well as the demonstrative slides presented by the parties during the hearing. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

**TABLE OF CONTENTS**

I. BACKGROUND ..... 3

II. LEGAL PRINCIPLES ..... 3

A. Claim Construction ..... 3
B. Departing from the Ordinary Meaning of a Claim Term ..... 6
C. Indefiniteness ..... 7

III. LEVEL OF ORDINARY SKILL IN THE ART ..... 7

IV. CONSTRUCTION OF DISPUTED TERMS ..... 8

A. Term #1: "the representation consists of only one option for activating the function" ('879 Patent Claims 1) ..... 11
a. The Parties' Positions ..... 12
b. The Court's Analysis ..... 17
B. Term #2: "gliding" (claims 1, 12) / "the object gliding along the touch sensitive area" (claim 1) / "gliding the object along the touch sensitive area" (claim 12). 19
a. The Parties' Positions ..... 20
b. The Court's Analysis ..... 22

V. CONCLUSION ..... 22

## I. BACKGROUND

Neonode asserts that Samsung infringes claims of U.S. Patent No. 8,095,879 ("'879 patent" or the "Asserted Patent").

## II. LEGAL PRINCIPLES

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed.

Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988));

*see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. Yet "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

### B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[1] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

[1] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g.*, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C. Indefiniteness

"[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application was filed. *Id.* at 911.

## III. LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art ("POSITA"). *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in

determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

The parties do not dispute the qualifications of a POSITA, at least not at this stage in the case. Regarding the Asserted Patents, Samsung's expert, Dr. Andy Cockburn, opines that a POSITA would have "bachelor's degree in computer science or computer engineering, or the equivalent education, and at least two years of experience in user interface design and development. Additional years of experience could substitute for formal education, and vice versa." ECF No. 71-2 ¶ 35. Neonode does not rely on an expert for its claim construction briefing, nor does it dispute Samsung's level of skill. *See generally* ECF Nos. 81, 86.

Given that the parties do not dispute the qualifications of a POSITA at this time, and considering the factors that may be considered in determining the level of skill in the art, the Court finds that a person of ordinary skill in the art is as defined by Samsung's expert, as discussed above for the Asserted Patents.

## IV. CONSTRUCTION OF DISPUTED TERMS

The parties' dispute the meaning and scope of two terms or phrases in the Asserted Patent. Each dispute is addressed below.

The '879 patent relates generally to a user interface for a mobile handheld computer that comprises a touch sensitive area that allows a user to navigate among simultaneously running applications. '879 patent at 1:6–12. The annotated version of Figure 1 of the '879 patent

reproduced below illustrates an embodiment of this "user interface" with "a touch sensitive area 1, which is divided into a menu area 2 and a display area 3." *Id.* at 3:51–54. Menu area 2 is "adapted to present a representation of a first 21, a second 22 and a third 23 predefined function." *Id.* at 4:1–3.




In an embodiment, "FIG. 2 [below] shows that any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 [e.g., a finger] with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." *Id.* at 4:7–11 (emphasis added), FIG. 2 (annotated).




The "object 4 can be a finger" or "a pen or other pointing device." *Id.* at 6:11–15.

In the embodiment described in the patent, the activated "first function 21 is a general application dependent function" (*see* FIG. 3), the second function 22 is a keyboard function (*see* FIG. 5), and the third function 23 is a task and file manager (*see* FIG. 6). *Id.* at 4:4–6. Using Figure 3 as an example, once first function 21 is activated by touching the representation of that function (the "+" icon in FIG. 1) with an object and moving the object away from the menu area into the display area, "then the display area 3 is adapted to display icons 211, 212, 213, 214, 215, 216 representing services or functions." *Id.* at 4:12–14. The user then selects a particular service or function by tapping on the icon, such as icon 213 in Figure 3. *Id.* at 4:34–35.



Fig. 3.



Fig. 5.



Fig. 6.

*Id.* at FIGs. 3, 5–6.

**A. Term #1: "the representation consists of only one option for activating the function"** ('879 Patent Claims 1)

| **Claim Term** | **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** | **Court's Final Construction** |
|---|---|---|---|
| **"the representation consists of only one option for activating the function"** '879 Patent Claims 1. | Plain meaning | Indefinite | Indefinite |

Claim 1 of the '879 Patent, the sole independent claim, recites the claimed "user interface" comprises the following limitations:

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
>
> a touch sensitive area in which a representation of a function is provided, wherein *the representation* ***consists of only one option for activating*** *the function and wherein the function is activated by a multi-step operation* comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

’879 Patent at cl. 1 (emphasis added).

The word “option” does not appear in the specification. *See id.* Rather, the specification merely says that the menu area “present[s] a representation” of a first, second and third function (*id.* at 2:5–7, 4:1–3)—without ever explaining what that representation consists of—and also says, “that any one of these three functions” “can be activated” when the touch sensitive area “detects a movement of an object” (*id.* at 2:10–14, 4:7–11)—without ever addressing the “only one option for activating the function” claim requirement.

### a. The Parties’ Positions

#### *i. Samsung’s Position*

Samsung contends that the “claim phrase is indefinite because a POSITA can read it to mean at least three conflicting things—and thus impose three different sets of requirements on accused products and prior art.” ECF No. 71 at 5. According to Samsung, a POSITA would consider that phrase to have at least the following three possible meanings based on the claim language:

> (1) The representation represents a **single function** and there is only a **single option** to activate that function (e.g., only one specific input gesture will activate that function);
> (2) The representation may represent **multiple functions** but there is only a **single option** to activate one particular function (e.g., only one specific input gesture will activate one function, but a different input gesture activates a second function); and
> (3) The representation represents a **single function** and the claim allows **multiple options** to activate that function (e.g., any input gesture will activate that function).

*Id.* at 6. Indeed, Samsung created the following useful graphic to understand its position on the indefiniteness of this claim phrase (where “R” refers to representation, “f” refers to a function and “g” refers to a type of gesture):




*Id.*

Samsung explains why a POSITA would understand the claim language to support each of the above interpretations. *First*, Samsung argues the claim language supports meaning (1) because the claim recites "the function" (in the singular) and a POSITA could read that language as referring to a single function; and (b) a POSITA could read the "only one option" language to require that only one specific gesture may activate the one function. *Id.* at 7. *Second*, Samsung argues the claim language supports meaning (2) because: (a) a POSITA recognizes the antecedent basis of "the function" is "a function" and knows the use of the "a" could be read by a POSITA to permit one or more functions; and (b) a POSITA could read the "only one option" language to require that only one specific gesture may activate any given function. *Id. Third*, Samsung argues the claim language supports meaning (3) because a POSITA could read the "only one option" language as limiting "the representation" to one function (rather than limiting the number of activating gestures), in which case the claim recites a single function that any input gesture may activate. *Id.* Samsung therefore argues that the scope of claim 1 varies significantly depending on which of these three meanings applies, and no informed and confident choice is available among the contending definitions. *Id.*

Samsung further contends that the prosecution history confirms that the claims are

indefinite. *Id.* at 8. According to Samsung, applicant Neonode Inc. added the disputed claim limitation during prosecution to distinguish the claims from the prior art Hirshberg reference. *Id.* (citing ECF No. 71-3 at 2, 8–9). In attempting to distinguish Hirshberg, Neonode stated that "Hirshberg teaches a touch and glide operation only for keys that comprise several characters" and that, "[i]n distinction, the claimed invention uses a multi-step touch-and-glide operation for representations that consist of only one option for activating a function." *Id.* at 8–9. Samsung contends that this statement was made to distinguish the patent's claims from Hirshberg because although the claimed "representation" corresponds to only one function, each of the individual keys represented in Hirshberg could perform multiple functions (i.e., the entry of different characters depending on what gesture the user performed on the key). *Id.* at 9. Neonode Inc. similarly stated, with respect to the specification, that elements 22 and 23 (two of the three exemplary "representations" used in the specification at col. 4:1–6) each "consists of the one option" of opening their respective functions, again indicating that the "one option" claim language refers to the correspondence between a representation and its corresponding one function. *Id.*

In identifying support in the specification for its amendment, Neonode Inc. also told the PTO that "each representation . . . consists of only one option for activating its corresponding function." *Id.* In contrast to the above-discussed distinction—which focuses on the claimed representation corresponding to only one function—Samsung asserts that "this statement instead appears to also assert there is only one option ***(gesture)*** to activate a representation's corresponding function." *Id.* (emphasis added).

That's not all. Samsung also contends that Neonode increased uncertainty about this claim during the IPR proceeding initiated by Google on the '879 patent (IPR2021-01041) ("Google IPR"). *Id.* at 10. According to Samsung, during the Google IPR, Neonode initially explained that

the "representation presents the user with one option of what to activate," indicating that the "one option" claim language relates to the correspondence between the representation and one function. *Id.* Plaintiff also argued the "one-option limitation" should not be interpreted to "require that each function associated with the representation of the function can be activated only by one gesture." *Id.*

*ii. Neonode's Position*

Neonode responds that the claim is not indefinite because "the claim, the specification, the prosecution file, and the IPR record collectively provide clear guidance as to the meaning of this limitation: **the representation consists of only one option for activating one of the one or more functions at any given time.**" ECF No. 81 at 5 (emphasis in original). To arrive at its construction, Neonode divides some of the limitations in claim 1 of the '879 Patent into the three following parts:



The invention claimed is:

1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.



*Id.* at 6. According to Neonode, Limitation 1[a] recites a representation of a function; limitation 1[b] states a characteristic of the recited representation ("the representation consists of . . ."); and limitation 1[c] recites how the function is activated. *Id.* Neonode therefore argues that "consists of" limits "the representation." *Id.* Accordingly, Neonode explains that "consists of" neither limits

the number of functions that may be represented—addressed in limitation 1[a]—nor limits the number of ways to activate the represented function—addressed in limitation 1[c]. *Id.*

Because "the function" of limitation 1[b] relates back to a representation of "a function" in limitation 1[a], and the use of "a" carries a strong presumption that the claim covers "one or more" of the recited thing, Neonode contends that limitation 1[a] reads as "a touch sensitive area in which [one or more] representation[s] of [one or more] function[s] is[/are] provided." *Id.* (citing *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012)). And the use of "the" in limitation 1[b], referring to "the" represented function, connotes "the [one or more] function[s]." *Id.* Neonode thus argues that limitations 1[a] and 1[b], read together, inform a POSITA that, while a "representation" may represent more than one "function," it presents to the user only one option for activating one of those multiple functions at any given time.

In response to Samsung's contention that the specification fails to explain what the representations "consist of," Neonode asserts that the specification provides examples of the representations, which are depicted as graphical elements on the touch sensitive display. *Id.* at 7. And in response to Samsung's argument regarding the prosecution history, Neonode explains that although Samsung correctly notes that the "only one option" phrase was added during prosecution in order to overcome the Hirshberg reference, the applicant added the "only one option" language, which narrowed claim 1 to a combination that was not disclosed by Hirshberg: a representation that presents only one option for an activatable function at a given time ("representation [that] consists of only one option for activating a function"), which function is activatable by a touch and glide operation. *Id.* at 7–8. Neonode argues that the applicant explained that the specification discloses that each of representations 21–23 "consists of the one option of" activating a corresponding function. *Id.* at 8. Thus, the crux of Neonode's argument appears to boil down to

that the applicant allegedly argued to the PTO that the representation presents one option for activating a function at any given time (e.g., "displaying icons as appropriate for a currently active application."). *Id.* at 8–9.

**b. The Court's Analysis**

A claim is indefinite if its language, when read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 134 S. Ct. at 2124. Notably, "a patent does not satisfy the definiteness requirement of § 112 merely because 'a court can ascribe some meaning to a patent's claims.'" *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (quoting *Nautilus*, 134 S. Ct. at 2130). Rather, the claims "must provide objective boundaries for those of skill in the art." *Id.* Here, the Court finds, consistent with its oral ruling, claim 1 fails the definiteness requirement because the disputed claim language—which goes to the heart of the claimed "interface"—"'might mean several different things and no informed and confident choice is available among the contending definitions.'" *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (quoting *Nautilus*, 134 S. Ct. at 2130 n.8).

As explained above, the word "option" does not appear in the specification (much less the broader phrase "only one option for activating the function"). Rather, the specification merely says that the menu area "'present[s] a representation' of a first, a second and a third function" ('879 patent at 2:5–7, 4:1–3)—without ever explaining what that representation consists of—and also says, "that any one of these three functions" "can be activated" when the touch sensitive area "detects a movement of an object" (*id.* at 2:10–14, 4:7–11)—without ever addressing the "only one option for activating the function" claim requirement.

Neonode contends that the plain meaning of this term is that the representation consists of

only one option for activating one of the one or more functions at any given time. According to Neonode, Samsung's indefiniteness argument relies on the erroneous assumption that the term "option" refers to the ***gesture*** required to activate the one or more functions. *See* ECF No. 81 at 9; ECF No. 86 at 2. Based on the prosecution history, Neonode instead contends that the "only one option" language refers to "a representation that ***presents only one option*** for an activatable function at a given time." ECF No. 81 at 8 (emphasis added).

The problem with Neonode's argument is that it is unclear to a POSITA whether the claim term "only one option" refers to either a ***gesture*** or ***function*** (as Samsung asserts) or to ***presenting the user with an icon*** (as Neonode appears to contend). Again, the specification does not define "option." Although the Plaintiff cites the prosecution history for the notion that "option" does not refer to a gesture, the Court finds that it is unclear to a POSITA what the claimed "option" is. *See* ECF No. 81 at 9; ECF No. 86 at 2. Indeed, Neonode confirms that it is contending that the claimed "option" refers not to "gestures" or "functions," but to what the patent describes as "icons." *See* ECF No. 81 at 8 ("The applicant's reliance on representation 21—corresponding to an 'application dependent' function that can cause the display to present different sets of icons to the user depending on context, such as whether a currently active application is running—***makes it clear*** that the representation ***presents one option*** for activating a function at any given time (***e.g., displaying icons*** as appropriate for a currently active application.") (emphasis added).

Critically, the patentee knew how to claim these graphical user interface elements—it called them "***icons***." *See, e.g.*, '879 Patent at cl. 2 ("wherein the function, when activated, causes the user interface to display ***icons*** representing different services or settings for a currently active application.") (emphasis added). By contrast, the patentee here used the term "***option***," and it is unclear to a POSITA (or this Court) whether "option" refers to a graphical user interface element,

a gesture to activate the function, or even the function itself. And as explained above in the summary of Samsung's argument, if the term "option" does indeed refer to gestures or functions (rather than "icons" or graphical user interface elements), then there are three equally competing interpretations of what this claim term means. And because there is "no informed and confident choice [that] is available among the[se] contending definitions"; the Court must find that the claim term is indefinite. *Media Rights*, 800 F.3d at 1371.

In sum, for at least the reasons identified above, the reasons stated in Samsung's briefing, and the reasons identified in the Court's oral ruling on the record, the Court finds that this term is indefinite.

### B. Term #2: "gliding" (claims 1, 12) / "the object gliding along the touch sensitive area" (claim 1) / "gliding the object along the touch sensitive area" (claim 12)

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Final Construction |
|---|---|---|---|
| **"gliding"** (claims 1, 12) / **"the object gliding along the touch sensitive area"** (claim 1) / **"gliding the object along the touch sensitive area"** (claim 12) | Plain meaning, not including a drag and drop operation | "gliding": Indefinite<br>Remainder of claim term: No construction necessary; plain and ordinary meaning | Plain and ordinary meaning, not including dragging, flicking, or a drag and drop operation |

Claim 1 of the '879 Patent, the sole independent claim, recites the claimed "user interface" comprises the following limitations:

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
>
> a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function

> is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) *the object **gliding** along the touch sensitive area* away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

’879 Patent at cl. 1 (emphasis added). The specification, however, never uses the words “glide,” “flick” or “drag,” or any variations thereof. Instead, the specification recites activating a function by detecting the “movement of an object” as shown in Figure 2. *See id.* at 4:7–9, 2:10–12 (emphasis added).

**a. The Parties’ Positions**

Samsung contends this term is indefinite because Neonode’s statements in the IPRs leave a POSITA unable to determine what does and what does not constitute “gliding.” ECF No. 71 at 12. According to Samsung, the Court should not adopt the “plain meaning” portion of Neonode’s construction because “glide” does not have a plain meaning to a POSITA and there is no intrinsic evidence that allows a POSITA to determine either the boundaries of that term, or whether a given user gesture is a “glide,” a “drag” or a “flick.” *Id.* at 13.

Neonode disagrees. According to Neonode, the intrinsic record provides a POSITA with ample guidance as to what “gliding” means. ECF No. 81 at 12. Neonode first contends that the claims use “gliding” according to its ordinary meaning: a smooth, continuous movement across or along a surface. *Id.* (citing various dictionary definitions). But Neonode contends that this does not include a “flicking” gesture, which is a sharp, quick movement. *Id.* at 13. Neonode also explains that “[a] POSITA would also understand that ‘gliding’ does not include a ‘drag’/’drag-and-drop’ gesture, which connotes a logical and (typically) visual dragging of a target across a display in order to drop it into a specific area.” *Id.*

Neonode also contends that prosecution file provides further guidance. *Id.* At one point,

application claim 1 recited "moving in a direction from a starting point that is the representation [of a function] . . . to said display area . . . ." *Id.* To demonstrate the novelty of the invention, the applicant provided the Examiner with a link to Neonode's promotional video for a commercial embodiment, the Neonode N2 phone. *Id.* (citing ECF No. 81-14 (N2-Advertisement-Video)). The video showed a user activating functions by touching a thumb to locations that map to representations 21–23 and then smoothly moving the thumb from the icon upward along the display:




*Id.* (citing screenshots from ECF No. 81-14 at 00:26–00:27). According to Neonode, this movement of the user's thumb embodies the movement depicted in Figure 2. *Id.* No touched icon moves with the user's thumb, as would typically be the case in a drag-and-drop operation. And, as shown by the video, the movement is a smooth glide. *Id.* Neonode contends that this in no way resembles a "flick." *Id.*

After reviewing the video, Neonode explains that the examiner stated that he could "now see the difference between the prior art of record and the present application," but that the claims were "still too broad to suggest without research what was shown in the video demonstration." *Id.* at 14–15. In response, the applicant narrowed the claim from "moving" to a specific type of movement: "gliding . . . away from the location [of the representation of a function]." *See id.* at 15. The applicant explained that "[t]he subject claimed invention teaches 'rubbing', 'touch-and-glide' movements to operate a user interface, whereby the thumb touches a touch-sensitive screen

and rubs, or glides, along the screen without lifting the thumb," as illustrated in Figure 2. *See id.* Subsequently, the applicant again equated the "gliding" motion with swiping or rubbing, stating that the gesture is conducted "without lifting the finger" from the display. *See id.*

**b. The Court's Analysis**

The Court finds that Samsung fails to sufficiently show that "gliding" is indefinite in view of the intrinsic record. The claims use "gliding" according to its ordinary meaning: a smooth, continuous movement across or along a surface. Although Neonode has distinguished "gliding" from "flicking," "dragging," and a drag and drop operation throughout the prosecution history and in its IPR, Neonode has sufficiently distinguished "gliding" from "dragging" to render it not indefinite. Importantly, both the examiner and the PTAB, although not expressly addressing indefiniteness, came to understand the differences between these movements. Therefore, the Court finds that "gliding" should receive its plain and ordinary meaning, not including "dragging," "flicking," or a drag and drop operation.

## V. CONCLUSION

The Court adopts the constructions listed in the Claim Construction Order concurrent with this memorandum. Furthermore, the Parties should ensure that all testimony that relates to the terms addressed in this memorandum is constrained by the Court's reasoning. But in the presence of the jury, the Parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this memorandum that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED** this 14th day of July, 2023.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| NEONODE SMARTPHONE LLC,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO. LTD, and SAMSUNG ELECTRONICS AMERICA, INC.,<br><br>Defendants. | Civil Action No. 6:20-cv-00507-ADA |

## FINAL JUDGMENT

The Court entered an Order setting forth its Final Claim Constructions on July 14, 2023. ECF No. 94 ("Final Claim Construction Order"); *see also* ECF No. 95 (Memorandum Opinion). In its Final Claim Construction Order, the Court found that the claim term "the representation consists of only one option for activating the function" is indefinite. This claim term is an element of claim 1 of U.S. Patent No. 8,095,879 ("'879 patent"), which is the sole independent claim of the '879 patent. This claim term is therefore part of every claim of the '879 patent. Accordingly, all claims of the '879 patent are invalid as indefinite under 35 U.S.C. § 112, ¶ 2.

The Court now enters its Judgment as follows:

**IT IS ORDERED** that final judgment is entered in favor of Defendants and against Plaintiff. Plaintiff shall take nothing by this action.

**IT IS FURTHER ORDERED** that any and all motions not previously ruled upon by the Court are DENIED as moot.

**IT IS FURTHER ORDERED** that the Parties bear their own costs and fees.

**IT IS FINALLY ORDERED** that the Clerk of Court is directed to close the case.

**SIGNED** this 2nd day of August, 2023.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

US008095879B2

(12) **United States Patent**
**Goertz**

(10) **Patent No.:** **US 8,095,879 B2**
(45) **Date of Patent:** **Jan. 10, 2012**

(54) **USER INTERFACE FOR MOBILE HANDHELD COMPUTER UNIT**

(75) Inventor: **Magnus Goertz**, Stockholm (SE)

(73) Assignee: **Neonode Inc.**, Santa Clara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1228 days.

(21) Appl. No.: **10/315,250**

(22) Filed: **Dec. 10, 2002**

(65) **Prior Publication Data**

US 2004/0109013 A1 Jun. 10, 2004

(51) **Int. Cl.**
***G06F 3/00*** (2006.01)

(52) **U.S. Cl.** .......................... **715/716**; 715/864; 715/702

(58) **Field of Classification Search** .................. 715/864, 715/702

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,790,028 A 12/1988 Ramage
5,053,758 A * 10/1991 Cornett et al. ................ 345/174
5,283,558 A 2/1994 Chan
5,406,307 A * 4/1995 Hirayama et al. ............ 715/800
5,603,053 A * 2/1997 Gough et al. ..................... 710/5
5,900,875 A * 5/1999 Haitani et al. ................ 715/840
5,956,030 A * 9/1999 Conrad et al. ................ 715/769
6,052,279 A * 4/2000 Friend et al. .................. 361/686
6,085,204 A * 7/2000 Chijiwa et al. ................ 715/246
6,346,935 B1 * 2/2002 Nakajima et al. ............. 345/173
6,542,191 B1 * 4/2003 Yonezawa ................ 348/333.01
6,597,345 B2 * 7/2003 Hirshberg ..................... 345/168
6,639,584 B1 10/2003 Li
6,727,917 B1 * 4/2004 Chew et al. ................... 715/765
6,734,883 B1 * 5/2004 Wynn et al. ................... 715/830
6,833,827 B2 * 12/2004 Lui et al. ........................ 345/173
6,988,246 B2 * 1/2006 Kopitzke et al. .............. 715/810
7,006,077 B1 * 2/2006 Uusimaki ..................... 345/173
7,030,861 B1 * 4/2006 Westerman et al. .......... 345/173

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0 330 767 B1 10/1993

OTHER PUBLICATIONS

Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Peachpit Press. 2000. Berkeley, CA. Pages xiii, 12, 25, 26, 28-30, 40, 47, 246 and 253.*

(Continued)

*Primary Examiner* — Ryan Pitaro
(74) *Attorney, Agent, or Firm* — Soquel Group LLC

(57) **ABSTRACT**

The present invention relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area (**1**), which is divided into a menu area (**2**) and a display area (**3**). The computer unit is adapted to run several applications simultaneously and to present an active application on top of any other application on the display area (**3**). The menu area (**2**) is adapted to present a representation of a first (**21**), a second (**22**) and a third predefined (**23**) function. The first function (**21**) is a general application dependent function, the second function (**22**) is a keyboard function, and the third function (**23**) is a task and file manager. Any one of these three functions can be activated when the touch sensitive area (**1**) detects a movement of an object with its starting point within the representation of the function on the menu area (**2**) and with a direction from the menu area (**2**) to the display area (**3**).

**17 Claims, 4 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,159,763 | B2 * | 1/2007 | Yap et al. | 235/375 |
| 7,225,408 | B2 * | 5/2007 | O'Rourke | 715/743 |
| 7,286,063 | B2 * | 10/2007 | Gauthey et al. | 341/34 |
| 7,880,724 | B2 * | 2/2011 | Nguyen et al. | 345/168 |
| 2001/0002694 | A1 | 6/2001 | Nakazawa et al. | |
| 2001/0022579 | A1 | 9/2001 | Hirabayashi | |
| 2001/0026268 | A1 | 10/2001 | Ito | |
| 2001/0028344 | A1 | 10/2001 | Iwamoto et al. | |
| 2001/0055006 | A1 | 12/2001 | Sano et al. | |
| 2002/0002326 | A1 * | 1/2002 | Causey et al. | 600/300 |
| 2002/0027549 | A1 * | 3/2002 | Hirshberg | 345/168 |
| 2002/0046353 | A1 * | 4/2002 | Kishimoto | 713/202 |
| 2002/0171691 | A1 * | 11/2002 | Currans et al. | 345/864 |
| 2004/0021643 | A1 * | 2/2004 | Hoshino et al. | 345/173 |
| 2004/0100510 | A1 * | 5/2004 | Milic-Frayling et al. | 345/864 |
| 2005/0035956 | A1 * | 2/2005 | Sinclair et al. | 345/184 |

OTHER PUBLICATIONS

Strietelmeier, Julie. "Palm m100." The Gadgeteer. 2000. <http://www.the-gadgeteer.com/review/palm_m100_review> pp. 1-8.*

Venolia et al, T-Cube: A Fast, Self-Disclosing Pen-Based Alphabet, Apr. 24, 1994, pp. 265-270.*

Venoila et al, T-Cube: A Fast, Self Disclosing Pen-Based Alphabet, 1994, pp. 265-270.*

Karlson et al, AppLens and LaunchTile:Two Designs for One-Handed Thumb Use on Small Devices, CHI 2005.*

Dulberg et al, An Imprecise Mouse Gesture for the FAst Activation of Controls, Interact 1999, pp. 1-8.*

Rogue, Palm Pilot: The Ultimate Guide, 2nd Edition,1998, O'Reilly and Associates, Inc. pp. 1-17.*

* cited by examiner




*Fig. 1.*




*Fig. 2.*




*Fig. 3.*




*Fig. 4.*




*Fig. 5.* 22




*Fig. 6.*




*Fig. 7.*




*Fig. 8.*




Fig. 9.




Fig. 10.




Fig. 11.




Fig. 12.




Fig. 13.




Fig. 14.

# USER INTERFACE FOR MOBILE HANDHELD COMPUTER UNIT

## TECHNICAL FIELD

The present invention relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area, and which touch sensitive area is divided into a menu area and a display area.

The computer unit is adapted to run several applications simultaneously and to present any active application on top of any other application on the display area.

The present invention also relates to an enclosure for a handheld computer unit.

The present invention also relates to a computer readable medium. A computer program product with computer program code is stored within the computer readable medium, which code, when read by a computer, will make it possible for this computer to present a user interface according to the invention.

## DESCRIPTION OF BACKGROUND ART

Mobile handheld computers are known in various embodiments. One kind of handheld computer is the personal digital assistant (PDA), which is getting more and more powerful.

Another kind of handheld computer unit is the mobile phone, which also is getting more and more powerful. There are also examples of where the mobile phone and the PDA are merging into one unit.

A third kind of handheld computer is the laptop computer, which is getting smaller and smaller, even competing in size with the PDA's.

The need to manage more information has led the development towards new solutions regarding user interfaces and navigation. The PDA's and mobile phones are getting larger and larger in order to provide a user-friendly interface.

Since the users have gotten used to small handheld units, it is hard to move towards larger units. This has led to foldable keyboards, different kinds of joy sticks and different kinds of touch sensitive displays and pads intended to help in providing a user interface that is suitable for small handheld computer units.

## SUMMARY OF THE PRESENT INVENTION

### Technical Problems

It is a problem to provide a user-friendly interface that is adapted to handle a large amount of information and different kinds of traditional computer-related applications on a small handheld computer unit.

It is a problem to provide a user interface that is simple to use, even for inexperienced users of computers or handheld devices.

It is a problem to provide a small handheld computer unit with an easily accessible text input function.

It is also a problem to provide a simple way to make the most commonly used functions for navigation and management available in the environment of a small handheld computer unit.

### Solution

Taking these problems into consideration, and with the staring point from a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area, which touch sensitive area is divided into a menu area and a display area, which computer unit is adapted to run several applications simultaneously and to present an active application on top of any other application on the display area, the present invention teaches that the menu area is adapted to present a representation of a first, a second and a third predefined function, where the first function is a general application dependent function, the second function is a keyboard function, and the third function is a task and file manager. The present invention also teaches that any one of these three functions can be activated when the touch sensitive area detects a movement of an object with its starting point within the representation of the function on the menu area and with a direction from the menu area to the display area.

With the purpose of providing a simple way of managing any application or the operations system, the present invention teaches that if the first function is activated, the display area is adapted to display icons representing services or settings, depending on the current active application. One of the icons always represents a "help"-service, regardless of application. The icons are adapted to represent services or settings of the operations system of said computer unit, such as background picture, clock, users, help, etc. if no application is currently active on the computer unit.

Selections of preferred service or setting is done by tapping on corresponding icon.

With the purpose of providing the access to a text input function in any application in the computer unit, the present invention teaches that when the second function is activated, the display area is adapted to display a keyboard and a text field,

If a text passage in an active application is highlighted, then this text passage is displayed in the text field for editing through the keyboard and that the highlighted text passage is replaced by the edited text passage when the second function is deactivated.

If no text passage in an active application is highlighted, then the text field is available for inputting and editing of text through the keyboard.

In the case of the latter the first function can be activated, or the second function can be closed, in which a choice of saving or deleting the inputted text is given. The choice of saving the inputted text results in an activation of the first function. In this case the first function will present services or settings available for the inputted text, such as saving the inputted text for later use, using the inputted text as telephone number in a telephone application, or sending the inputted text as message in communications application.

In order to provide a task and file management in a user interface for a handheld mobile computer, the present invention teaches that, if the third function is activated, the display area is adapted to display a list with a library of available applications and files on the computer unit. A selection of an application will start the application, and a selection of a file will open the file in an application intended for the file.

A selection of an application or a file is done by moving the object so that the representation of desired application or file is highlighted, removing the object from the touch sensitive area, and then tapping on the touch sensitive area.

According to the present invention a navigation in the list is performed by moving the object in a direction towards the top of the list or towards the bottom of the list. This will cause the marking to move in the same direction. The speed of the movement of the marking is lower than the speed of the movement of the object, with the purpose of making the navigation easier.

The user interface of the present invention is specifically adapted to be used with a small computer unit where the size of the touch sensitive area is in the order of 2-3 inches, The user interface is also adapted to be operated by one hand, where the object can be a finger, such as the thumb, of a user of the computer unit.

## Advantages

Those advantages that can be primarily associated with a user interface or a computer readable medium according to the present invention reside in the ability to establish a user-friendly interface for small handheld computers, both regarding general application set-up functions, text input functions, and file and task management.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will now be described in more detail with reference to the accompanying drawings, in which

FIG. **1** is a schematic and highly simplified view of a touch sensitive area on a mobile handheld computer unit;

FIG. **2** is a schematic side view illustrating the activation of a function;

FIG. **3** is a schematic illustration of a first function;

FIG. **4** is a schematic side view illustrating the selection of a service or setting represented by an icon;

FIG. **5** is a schematic illustration of a second function;

FIG. **6** is a schematic side view illustrating the selection of a third function;

FIG. **7** is a schematic illustration of an application or file;

FIG. **8** is a schematic illustration on how navigation is performed;

FIG. **9** is a schematic illustration of how the content of the display are is changed;

FIG. **10** is a schematic side view further illustrating how navigation is performed;

FIG. **11** is a schematic illustration of moving forwards in an application;

FIG. **12** is a schematic illustration of moving backwards in, or closing, an application;

FIG. **13** is a schematic illustration of an enclosure

FIG. **14** shows a computer readable medium in the form of a solid state memory.

## DESCRIPTION OF EMBODIMENTS AT PRESENT PREFERRED

FIG. **1** illustrates a user interface for a mobile handheld computer unit. The user interface according to the present invention is specifically adapted to computer units comprising a touch sensitive area **1**, which is divided into a menu area **2** and a display area **3**. It should be understood that there are several different kinds of known touch sensitive displays and that the present invention does not depend on what kind of touch sensitive display that is used in relation to the inventive user interface.

The computer unit is adapted to run several applications simultaneously and to present an active application on top of any other application on the display area **3**. It should be understood that by simultaneously it is meant any technology that will make it appear to a user of the computer unit that applications are run simultaneously and that the present invention does not depend on how this is realised, whether it is through time-sharing of one processor, parallel use of several processors, or any other technique.



According to the present invention the menu area **2** is adapted to present a representation of a first **21**, a second **22** and a third **23** predefined function.

The first function **21** is a general application dependent function, the second function **22** is a keyboard function, and the third function **23** is a task and file manager.

FIG. **2** shows that any one of these three functions **21**, **22**, **23** can be activated when the touch sensitive area **1** detects a movement of an object **4** with its starting point A within the representation of a function on the menu area **2** and with a direction B from the menu area **2** to the display area **3**.

FIG. **3** shows that if the first function **21** is activated, then the display area **3** is adapted to display icons **211**, **212**, **213**, **214**, **215**, **216** representing services or functions depending on the current active application. One of the icons, in the figure exemplified by icon **211**, always represents a “help”-service, regardless of application. Any key that, because of lack of space on the display area, or because the key should be hidden from the active application, or because of any other reason is not shown on the display area of an active application, can be represented by one of the icons **212**, **213**, **214**, **215**, **216** that is shown when the first function **21** is activated.

If for instance the active application handles a picture, then the icons that are shown when the first function is activated can be services such as “save to disk”, “send as SMS”, or “delete” and they can be settings such as “resolution”, “colour”, or “brightness”.

If no application is currently active on the computer unit, then the icons **211**, **212**, **213**, **214**, **215**, **216** are adapted to represent services or settings of the operations system of the computer unit, such as background picture, clock, alarm **215**, users **213**, help **211**, etc.

FIG. **4** shows that selection of a preferred service or setting is done by tapping C, D on corresponding icon **213**.

FIG. **5** shows that if the second function **22** is activated, then the display area **3** is adapted to display a keyboard **221** and a text field **222**.

Two different scenarios can be at hand when this function key is activated. A first scenario can be that a text passage in the active application is highlighted as the second function is activated. If this is the case then the highlighted text passage is displayed in the text field **222** for editing through the keyboard **221**.

The highlighted text passage is replaced by the edited text passage when the second function **21** is deactivated.

A second scenario can be that no text passage in the active application is highlighted. If this is the case then the text field **222** is available for inputting and editing of text through the keyboard **221**.

In the case of the latter scenario, the first function **21** can be activated, or the second function **22** can be closed. If the second function **22** is closed then a choice of saving or deleting the inputted text is given, where the choice of saving the inputted text results in an activation of the first function **21**.

As the first function **21** is activated with the second function **22** as currently active application the first function **21** will present services or settings available for the inputted text, such as saving the inputted text for later use, using the inputted text as telephone number in a telephone application, or sending the inputted text as message in communications application, such as e-mail, SMS, or fax.

FIG. **6** shows that if the third function **23** is activated, then the display area **3** is adapted to display a list **231** with a library of available applications and files on the computer unit.

A selection of an application will start the application, and a selection of a file will open the file in an application intended

for the file. The name of a selected file can be edited by activation of the second function **22** as the file is highlighted.

FIG. **7** shows that a selection of an application or a file is done by moving E the object **4** so that the representation of desired application or file is highlighted, removing F the object **4** from the touch sensitive area **1**, and then tapping G, H on the touch sensitive area **1**.

An application or file is highlighted by placing some kind of marking **232** on the representation of the application or file. This marking can be done in different ways, for example by putting a frame around the representation of the application or file, as shown in the figure, or by inverting the representation of the application or file.

It should be understood that all lists in the computer unit, such as a list of contact information in an address book, a list of e-mail messages in a mailbox, or a telephone log, can be managed in the above described manner.

The list **231** can be adapted to present only files or only applications. In this case, the top area of the list **231** can present a field **233** through which the content of the list **231** can be altered. If the list only presents files, then the field **233** can display a representation of a task manager and a selection of the field **233** will cause the list **231** to after to present only applications, and if the list **231** only presents applications, then the field **233** displays a representation of a file manager and a selection of the field **233** will cause the list **231** to after and present only files.

FIG. **8** shows that navigation in the list is performed by moving the object **4** in a direction I towards the top **231***a* of the list **231** or towards J the bottom **231***b* of the list **231**. This movement I, J of the object **4** will cause the marking **232** to move K, L in the same direction. The speed of the movement K, L of the marking **232** is lower than the speed of the movement I, J of the object **4**.

FIG. **9** shows that if the number of applications and/or files in the list **231** exceeds the number of applications and/or files that can be presented on the display area **3**, and if the object **4** is moved to the top or bottom position of the display area, then lifted, replaced on the display area, and then again moved to the top or bottom of the display area, then the content of the display area will be replaced one whole page, meaning that if the object **4** is positioned N at the bottom **3***b* of the display area **3**, then lifted, replaced on the display area **3**, and then again moved M to the bottom **3***b* of the display area **3**, then the content **31** of the display area **3** will be replaced P by the following applications and/or files **32** in the list **231**. In the same way, but not shown in the figure, if the object is positioned at the top of the display area, then lifted, replaced on the display area **3**, and then again moved to the top of the display area, the content of the display area will be replaced by the preceding applications and/or files in the list.

FIG. **10** shows that if the object **4** is removed Q from a first position **33** on the display area **3** and then replaced R, S on a second position **34** on the display area **3**, then the navigation can be continued T from the second position **34**.

FIG. **11** shows that moving U the object **4** from the left of the display area **3** to the right of the display area **3** moves the active application, function, service or setting on one step forwards. FIG. **12** shows that, in a similar manner, the active application, function, service or setting is closed or backed one step by moving V the object **4** from the right of the display area **3** to the left of the display area **3**.

As shown in FIG. **1**, the menu area **2** is positioned at the bottom of the touch sensitive area **1**. The representation of the first function **21** is positioned at the left side of the menu area **2**, the representation of the second function **22** is positioned at the middle of the menu area **2**, and the representation of the third function **23** is positioned at the right side of the menu area **2**.

As shown in FIG. **13**, the present invention relates to a user interface for a hand held mobile unit that preferably can be manageable with one hand. Hence the present invention teaches that the user interface is adapted to a touch sensitive area **1** with a size that is in the order of 2-3 inches, meaning the diagonal distance W between two corners of the touch sensitive area **1**.

The user interface is adapted to be operated by one hand, where the object **4** can be a finger, such as the thumb shown in the figures, of a user of the computer unit. It should be understood though that the present invention might also be used with another object, such as a pen or other pointing device.

According to one preferred embodiment of the present invention the computer unit is covered with an enclosure **5**, which is provided with an opening **51** for the display area **3**, and where the representations of the menu area **2** is printed on top of the enclosure **5**. It should be understood that the opening **51** might be a transparent part of the enclosure **5** or that it might be an open aperture depending on among other things technical considerations pertaining to the touch sensitive area **1**.

This makes it possible to allow the enclosure **5** to be removable and exchangeable.

FIG. **14** shows a computer readable medium, in the figure schematically shown as a solid-state memory **61**. A computer program product is stored within the computer readable medium. This computer program product comprises computer readable code **62**, which, when read by a computer **6**, will make it possible for the computer **6** to present a user interface according to the present invention.

The present invention also teaches that the computer program product is adapted to function as a shell upon an operations system.

It will be understood that the invention is not restricted to the aforedescribed and illustrated exemplifying embodiments thereof, and that these embodiments can be modified within the scope of the inventive concept illustrated in the accompanying Claims.

The invention claimed is:

**1**. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

**2**. The computer readable medium of claim **1**, wherein the function, when activated, causes the user interface to display icons representing different services or settings for a currently active application.

**3**. The computer readable medium of claim **2**, wherein the user interface is characterised in, that a selection of a preferred service or setting is done by tapping on a display icon corresponding to the preferred service or setting.

**4**. The computer readable medium of claim **1**, wherein the function, when activated, causes the user interface to display a keyboard and a text field.

**5**. The computer readable medium of claim **4**, wherein said text field is used for inputting and editing of text through said keyboard.

**6**. The computer readable medium of claim **1**, wherein the function, when activated, causes the user interface to display a list with a library of available applications and files on the mobile handheld computer unit.

**7**. The computer readable medium of claim **6**, wherein the user interface is characterised in, that a selection of an application or file is done by gliding the object along said touch sensitive area so that a representation of a desired one of said application or file is highlighted, raising said object from said touch sensitive area, and then tapping on said touch sensitive area.

**8**. The computer readable medium of claim **7**, wherein the user interface is characterised in, that at any given time said list presents only files or only applications, and that an area of said list presents a field through which said list can be changed from presenting files to presenting applications, or from presenting applications to presenting files.

**9**. The computer readable medium of claim **7**, wherein the user interface is characterised in, that, one item in said list is highlighted by a moveable marking, and the user interface enables list navigation whereby gliding the object along the touch sensitive area in a direction towards the top of said list or towards the bottom of said list causes said marking to move in the same direction without scrolling the list.

**10**. The computer readable medium of claim **9**, wherein the user interface is characterised in, that, if the number of applications or files in said list exceeds the number of applications or files that can be presented on said touch sensitive area as content, and if the object is (i) glided along said touch sensitive area to the top or bottom of said touch sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive area, and then (iv) again glided along said touch sensitive area to the top or bottom of said touch sensitive area, said list navigation pages the content of said list up or down by one whole page.



**11**. The computer readable medium of claim **10**, wherein the user interface is characterised in, that if the object is raised from any first position on said touch sensitive area and then replaced on any second position on said touch sensitive area, said list navigation can be continued from said second position.

**12**. The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is advanced one step by gliding the object along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

**13**. The computer readable medium of claim **1**, wherein the user interface is characterised in, that said representation of said function is located at the bottom of said touch sensitive area.

**14**. The computer readable medium of claim **1**, wherein the touch sensitive area is 2-3 inches in diagonal dimension.

**15**. The computer readable medium of claim **1**, characterised in, that said computer program code is adapted to function as a shell upon an operating system.

**16**. The computer readable medium of claim **1**, wherein the representation is finger-sized.

**17**. The computer readable medium of claim **1**, wherein the location where the representation is provided does not provide touch functionality for a different function.

* * * * *

# CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   [**X**] this brief contains __**13,589**_ words.

   [ ] this brief uses a monospaced type and contains [state the number of] lines of text.

2. This brief complies with the typeface and type style requirements because:

   [**X**] this brief has been prepared in a proportionally spaced typeface using [**Microsoft Word]** in [**14-Point Times New Roman]**; or

   [ ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated: December 18, 2023

/s/ Philip Graves
Philip Graves
Greer Shaw
GRAVES & SHAW LLP
355 S. Grand Ave., Suite 2450
Los Angeles, CA 90071ff
(213) 204-5101

Brian D. Melton
Bryce Barcelo
Rocco Magni
SUSMAN GODFREY L.L.P.

1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 653-7825

Kalpana Srinivasan
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100

*Counsel for Appellant NEONODE SMARTPHONE LLC*